**Rita CHURCH, Plaintiff,**

v.

**State of MARYLAND and Ronald Baldwin, Defendants.**

**Civ. No. AMD 00–3209.**

United States District Court,
D. Maryland.

Jan. 17, 2002.

Robin R. Cockey, Cockey, Brennan and Maloney, Salisbury, MD, for Rita M. Church.

Michele Joan McDonald, Glenn T. Marrow, Office of the Attorney General, Dept. of Public Safety and Corr. Services, J. Joseph Curran, Jr., Office of the Attorney General, for State of Maryland.

Morton Edelstein, Baltimore, MD, for Ronald Baldwin.

## MEMORANDUM

DAVIS, District Judge.

## I. INTRODUCTION

The plaintiff, Rita M. Church ("Church"), instituted this employment discrimination suit against her former employer, the State of Maryland ("the State"), where she worked for three years as a correctional officer, alleging hostile work environment/sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* Church also joined as a defendant a former coworker, Ronald Baldwin ("Baldwin"). Church alleges that Baldwin violated her rights under several federal and state constitutional provisions, including: (1) her rights to free association, due process and equal protection, as guaranteed by the First and Fourteenth Amendments of the U.S. Constitution, in claims asserted pursuant to 42 U.S.C. § 1983; and (2) her right not to be subjected to gender-based discrimination as guaranteed by the Equal Rights Amend-ment of the Maryland Constitution. Church also asserted two state common law claims against Baldwin: (1) intentional infliction of emotional distress and (2) invasion of privacy.

I granted, in substantial part, an earlier motion to dismiss filed by the State; discovery has been concluded. Now pending are separate motions for summary judgment filed by each defendant, which Church has opposed. I have given careful attention to the parties' memoranda and exhibits, and a hearing is not needed. Local Rule 105.6. For the reasons explained below, even assuming the truth of Church's uncorroborated testimony that Baldwin carried on an unrelenting two year campaign of sexual harassment against her, the record here establishes, as a matter of law under controlling Supreme Court and Fourth Circuit precedent, that Baldwin's acts are not imputable to the State and that, in any event, the State has established, again as a matter of law, its affirmative defense of reasonable care to avoid harm to employees such as Church from harassment. Furthermore, because a final judgment "in favor of [Baldwin] for costs" was entered in a prior state court lawsuit filed by Church against Baldwin, her present claims against Baldwin are barred by the doctrine of claim preclusion. Accordingly, I shall grant the defendants' motions for summary judgment and enter judgment in favor of defendants as to all remaining claims.

## II. SUMMARY JUDGMENT STANDARDS

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson*

*v. Liberty Lobby Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Id.* at 248, 106 S.Ct. 2505. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir.1991). Of course, the facts, as well as justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987).

## III. FACTS AND PROCEDURAL HISTORY

In this section, I shall set forth, in unavoidable detail, the facts, viewed in the light most favorable to Church (the nonmovant), out of which the claims in this case arise. I shall also describe the procedural history of the case and the related state court litigation.

### A. Church is Hired by the State

In 1997, Church began her employment for the Maryland Department of Public Safety and Correctional Services. After completing her training to become a correctional officer at the Maryland Correctional Training Academy ("Academy"), in June 1997, Church was assigned to the Division of Pretrial Detention Services. *Church Dep., May 30, 2001,* at 9–14 (hereinafter *Church Dep. I*). While at the Academy, Church received training on the State's sexual harassment policy, which included identifying on-the-job behavior that constitutes sexual harassment, and the procedure for filing complaints. *Church Dep. I* at 103–05, Ex. 2. Church testified that she did not receive a copy of the sexual harassment policy but she admitted that she was trained on the policy and on the reporting of sexual harassment. *Id.* at 104. Church seemed to suggest on deposition that the policy was not taken seriously; she claimed that "[the instructors] ... mentioned that the institution doesn't do things by the book." *Id.* at 105.

The Division of Pretrial Detention Services has two pretrial detention facilities: the Baltimore Central Booking and Intake Center ("BCBIC"), located at 300 E. Madison Street in Baltimore, and the nearby Baltimore City Detention Center ("BCDC"), located at 401 E. Eager Street, formerly known as the Baltimore City Jail. BCDC is comprised of several housing units, located in separate buildings, identified as the Men's Detention Center ("MDC"), the Women's Detention Center ("WDC"), the O'Brien House, the Graves Street facility, the Annex building, the Jail

Industries Building, and the Wyatt building. The MDC, the WDC, the Annex, and the Wyatt building may be accessed through the entrance at 401 E. Eager Street. The Jail Industries Building is located at 531 E. Madison Street.

Church was initially assigned to the Jail Industries Building but was then transferred to the MDC, on the 11:00 p.m. to 7:00 a.m. shift. *Church Dep. I* at 16. Initially, at the MDC, Church did not receive "assignments" but rotated through different posts. *Church Dep. I* at 18–19. She was then assigned to Main Control, described as the central area through which civilians and officers enter the MDC, as a radio dispatcher. *Id.* at 19–20. The shift commander was Major Anthony Jordan and then Major Naomi Williams. *Id.* at 20. According to Church, defendant Baldwin, who is today a corrections lieutenant, but was in 1997 a sergeant, served as Church's "immediate supervisor, performing [her] evaluations and generally serving in all respects as [her] 'boss.'" *Church Aff.* ¶ 2; *see Church Dep. I* at 17, 21. (As discussed *infra,* section IV.A.2., the contention that Baldwin was Church's supervisor is demonstrably untrue and must be rejected as a matter of law.)

### B. Church's Work–Related Injuries Cause Her to Remain Off the Job for Extended Periods of Time

On April 16, 1998, while working at the MDC, Church sustained a knee injury as the result of being hit with a hand truck being pushed by an inmate. *Church Dep. I* at 22–30. She re-injured her knee on July 2, 1998, in a second on-the-job mishap, which required her to undergo surgery. *Id.* at 31–33. According to her employee time records, Church took at least 72 days of accident leave as a result of her knee injuries, between November 18, 1998, and February 28, 1999. Moreover, by May 28, 1999, Church had exhausted her accrued sick leave, and by June 22, 1999, she had exhausted her personal, compensatory, and annual leave. Church received 50 days donated sick leave, which was used from July 3 through July 11, 1999; July 23 through September 7, 1999; and October 6 through October 19, 1999. After exhausting the donated leave, Church remained on leave without pay from October 20, 1999, until she returned to work on March 1, 2000.

A recurring theme throughout the period of Church's employment after her 1998 injuries centered on issues of leave, related medical issues and fitness for duty, worker's compensation issues, work assignments and Church's on-going grievances and appeals therefrom (at least one of which was successful), most if not all of which were related to the above issues. As addressed in greater detail *infra* sections III.G. and III.H., Church's employment ultimately was terminated, *inter alia,* for her failure to document the legitimacy of her absences from work.

### C. Church is Victimized by Baldwin's Harassing Behavior at Work

According to Church, from the very commencement of her employment in 1997 through 1999, Baldwin carried out an unrelenting campaign of verbal and, on at least two or three occasions, physical, sexual harassment, on what she essentially describes as a daily basis. Whenever no witnesses were present, it seems, Baldwin would engage in graphically vulgar and grossly explicit sexual banter, consisting of propositions for sexual liaisons, threats of adverse consequences upon Church's refusal, and related teasing and haranguing behavior.

Baldwin first harassed Church in June 1997 in the MDC. *Church Dep. I* at 55; *Church Aff.* at ¶ 3. She and Baldwin were walking down the hall when he commented to Church that she had a "fat ass."

*Church Dep. I* at 55; *Church Aff.* at ¶ 3. In June 1997, Church was assigned to work in the Jail Industries Building and was not reassigned to the MDC until July 23, 1997. *James Drewery, Security Chief, Aff.,* Attach. B (hereinafter *Drewery Aff.*). Church further testified that in June 1997 Baldwin, while walking with Church in the hallway, asked if he "could fuck [her] in the ass." *Church Dep. I* at 59–60. In June and July 1997, Baldwin asked Church if he could "feel [her] left tittie" and see her "undergarments." *Id.* at 61, 63–64, 66–67; *Church Aff.* at ¶ 3. Church testified that there were no witnesses to these interactions. *Church Aff.* at 119–21. Church also stated that she denied all of Baldwin's requests and told him that she was going to report him. *Id.* at 67–68; *Church Aff.* at ¶ 3.

Church testified that in September 1997, Baldwin asked her to go out on a date with him, but she rejected this offer. *Id.* ¶ 6; *Church Dep. I* at 131–32. Church also stated that Baldwin asked her to touch his genitals in September 1997. *Church Dep. I* at 134–35. Church further testified that in October 1997, Baldwin, while relating a story about his children carving a Halloween pumpkin, asked Church "what it would be like if [Church's] tit were stuffed through the hole in the pumpkin and [Baldwin] licked it." *Church Aff.* ¶ 6; *Church Dep. I* at 141. According to Church, "when [she] pleaded with him not to make remarks of that sort, he asserted, 'You're going to give in one day'; when [she] again rebuffed him, he said 'Everybody gives in, or they got shitty posts' (referring to his authority to make shift and posting assignments)." *Church Aff.* ¶ 6. She testified that she became scared that Baldwin would try to rape her if given the opportunity. *Id.; Church Dep. I* at 143–44.

According to Church, her fears that Baldwin would sexually assault her heightened in 1998 as Baldwin became more aggressive. *Church Aff.* ¶ 7. Church testified on deposition that, in January 1998, Baldwin would ask her if he could touch her breast and she would say no. *Church Dep. I* at 183. Baldwin also would say to her, "You're going to go out with me," to which she would respond in the negative, and then he would state that she was going to give in to his advances "sooner or later." *Id.* at 182. Baldwin also told her, again, that he wanted to "fuck her in the ass." *Id.* at 197. As a result of Church's resistance to Baldwin, Church testified, Baldwin began to give her extra work, treat her "abruptly," and to use a tone of voice towards her that she described as "yelling." *Id.* at 183–84.

In February 1998, Baldwin attempted to touch her left breast, and Church caught his hand and pushed him away. *Id.* at 198. Church further testified that, in March 1998, Baldwin made comments that female officers "have to fuck to keep their jobs." *Id.* at 121–26. Church stated that Romeo Joyner witnessed this comment, *id.* at 121–23, but she has not submitted an affidavit from Joyner to support her opposition to the motions for summary judgment and, indeed, Joyner specifically denied on deposition that he ever witnessed or overheard any of the acts or statements attributed to Baldwin by Church. *Joyner Dep.* at 50–51. Church testified, further, that Baldwin attempted to touch her on two separate occasions, once in April 1998 and once in May 1998. *Church Dep. I* at 266–68. In April 1998, Baldwin asked if he could put his hands down Church's pants and "touch her vagina"; when she refused, Baldwin said, "When are you going to let me fuck you?" to which Church replied, "Never." *Church Aff.* ¶ 7; *Church Dep. I* at 233. In her affidavit, Church also claims that Baldwin grabbed her left breast, *Church Aff.* ¶ 7, and she testified on deposition that, in

April 1998, Baldwin grabbed her buttocks. *Church Dep. I* at 269–70.

According to Church, by late 1998, her "emotional revulsion to Baldwin and his advances had increasingly manifested itself into physical symptoms such as dizziness, light headedness, and nausea." *Church Aff.* ¶ 8. She testified that after Baldwin asked to touch her she felt sick, nauseated, and dizzy. *Church Dep. I* at 236; *Church Dep. July 10, 2001*, at 475 (hereinafter *Church Dep. III*). Church developed a nervous habit of pulling her hair out. *Church Aff.* ¶ 8. In early 1999, Church was referred to a psychiatrist and psychologist who treated her for depression and anxiety. *Id.*

### D. The Evidence Surrounding Church's Assertion that She Reported the Harassment to Her Superiors in 1997 and Early 1999

Church testified that she reported the 1997 incidents of harassment to James Drewery, Security Chief, in June 1997, and that in August 1997 she prepared written grievances and reports of her interactions with Baldwin. She allegedly delivered these documents to a shift commander whose alleged signature appears on the documents. *Church Dep. I* at 58–60; 63–65, 84. The evidence that Church notified her superiors of Baldwin's alleged harassment in 1997 is thoroughly undermined, however, as recounted herein.

Church refers to James Drewery as Security Chief. Drewery was not appointed Security Chief, however, until May 13, 1998. *Drewery Aff.*, Attach. A, ¶ 2. Prior to this date, he served as a Shift Commander with the rank of Major. *Id.* ¶ 3. In August 1997, the Security Chief of the BCDC was Hakim M. Muhammad. *Id.* at Attach. B, ¶ 4.

In any event, Church first alleges that she approached Drewery in June 1997 regarding Baldwin's harassment and re-

quested that she be referred to the Employee Assistance Program ("EAP"). *Church Dep. I* at 69–70. Further, Church testified, when she met with Drewery in June 1997, she related to him that she wanted to file a discrimination charge regarding Baldwin's sexual harassment. *Id.* at 76. According to Church, Drewery attempted to dissuade her from doing so, responding that she should rethink this request as "sexual harassment is a serious charge" and that these alleged incidents amounted to a "he said, she said" situation in which she had no proof. *Id.; Church Aff.* at ¶ 4. Church testified that Drewery refused to file a sexual harassment complaint, to report her allegations, or to take any corrective action. *Church Dep. III* at 295–96. As a result of Drewery's alleged rebuffs, Church allegedly filed the August 16, 1997, grievance report. *Id.* The August 16 grievance states:

> Appealing the discussion [sic] of Chief of Security James Drewery on August 16, 1997. I ofc Rita M. Church stated to the Security Chief that Sgt Ronald Baldwin continuously [sic] sexually harassed me on the job[.] He stated my words against Sgt Ronald Baldwin.... Chief of Security discussion [sic] should be investigated and all monies should be returned to I ofc. Rita Church because money was taken unfairly.

Drewery categorically denies that he had any such conversations with Church. (Church never adequately explained on deposition the reference to "money." When she was asked what "monies" she was referring to, Church testified that after she complained to Drewery about Baldwin, she went to the dentist, and when she returned to work, "they began to pull [her] records in reference to my sick leave and started to harass me." *Church Dep. III* at 291. Church further asserted that she "had time, ... sick time. I had annual leave days, I had P[ersonal] L[eave] days,

and they had deducted monies from my paycheck." *Id.* at 297. Trying to explain how she could complain about monies being taken in the August 16, 1997, grievance, even though she only went to the dentist after that date, Church testified that "they had taken money previously. This is a pattern of harassment." *Id.* at 297–98. Upon further questioning, Church ultimately testified that the money was taken from her paycheck before she prepared the August 16 grievance. *Id.* at 299–304.)

Also on August 16, 1997, Church completed a "matter of record" report. This report states:

> I ofc Rita M. Church was constantly sexually harassed by Sgt. Ronald Baldwin who on every chance he got ask [sic] if he could touch my breast and if he could fuck I ofc Church in my ass. Sgt Ronald Baldwin would constantly assign me to a post near him. I ofc Church informed the appointed [sic] authority James Drewery and C-shift Major Naomi White that I could not perform my duties effectively because of Sgt Ronald Baldwin intense sexual harassment. I state that he would try to touch me he would say you have to fuck to keep your job. I ofc Church rejected all advances. On the above date of 8–16–97 I by Sgt Ronald Baldwin on Main Control whom I worked around on many occasions [sic] ofc Rita M. Church complained to warden John Price about Sgt Ronald Baldwin who stated that he was investigating the incident after my complaint to Security Chief James Drewery who stated it was my word against Sgt Ronald Balding [sic] and that I ofc Rita M. Church had no proof of the allegations.

As to this report, Church testified that she spoke to Drewery and C-shift Major Naomi White at various times in June, July, and August 1997. *Church Dep., August 16, 2001,* at 75–76 (hereinafter *Church*

*Dep. II*). She further testified that she complained to Assistant Warden John Price before speaking to Drewery and to White, *id.* at 77, and met with him on August 15, 1997. *Id.* at 83–84. Church also claimed, however, that in June, July, and August she told the Warden that she was being harassed and that the Warden told her that he would investigate. *Id.* at 77–78.

The documentary record concerning Church's alleged efforts to notify her superiors of the 1997 events is problematic, at best. Church produced two versions of the written grievance—one dated August 28, 1997, and one dated August 16, 1997. According to Church, the August 28 grievance is a re-creation of the original grievance which she wrote in August 1997, *Church Dep. I* at 257–59, which Church allegedly reproduced in August 1998. The August 16, 1997, report is the original one. *Church Dep. II* at 60. The August 28 version states that she spoke to Drewery about Baldwin on August 28, 1997, *Church Dep. I* at 260, although she now claims that the original grievance was written on August 16, 1997. Church testified that she recreated the August 28, 1997, grievance in August 1998 "[t]o get a recollection of exactly what had happened." *Id.* at 259. When asked why, she responded "why not?" *Id.*

Church testified that she wrote the original grievance on August 16, 1997, during a break in her shift, and then presented the grievance to Captain Bernard Young, who signed the grievance in her presence and presented her with a copy. *Church Dep. II* at 60–65. Church's time records for 1997 demonstrate, however, that Church did not work on August 15, 16, and 17, 1997, *Delores C. Jackson Aff.,* Attach. A, and Captain Young's post assignments and time record show that he did not work on August 15 and 16, 1997. *See*

*Bernard Young Aff.*, Ex. B, ¶ 6. Church insisted, however, that she worked on both the 15th and the 16th. *Church Dep. II* at 81–84. Young, now retired, states under oath that he never received any grievance from Church regarding sexual harassment, *Bernard Young Aff.* ¶ 4, and that the purported signature on the form is not his signature. *Id.* He further explains that a "matter of record" would be assigned a control number and would be immediately forwarded to his superior. *Id.* at ¶¶ 8, 9. Finally, Young would not have had authority to review a complaint about the acts or omission of the Security Chief. *Id.*

Church testified that she again met with Drewery about the sexual harassment in May 1999. *Church Dep. I* at 105. She stated that she "[v]erbally complained constantly on a continuous basis" to Drewery in May 1999 and to Major Naomi Williams in 1999. *Id.* at 105–09. However, Williams was unable to meet with her as Williams "had to pick up her sister and didn't have time to listen." *Id.* at 108. Church also attempted to meet with Warden Roland Merritt in 1999, but he declined to meet with her. *Id.* 107, 109. According to Church, Assistant Warden John Price also rebuffed her efforts to discuss the harassment and he declined to meet with Church in May 1999 because he "stated he was having some work done on his office, and couldn't see me." *Id.* at 111. Church admitted that she never actually met with any of these managers except Drewery. *Id.* at 108–11.

E. Church Allegedly Receives a Harassing Letter and Tape Recording at Her Home from Baldwin

As mentioned, Church went out on leave in 1999. *Church Dep. III* at 476. In or about July 1999, while Church was out on leave, she allegedly received an audio tape cassette and a letter, which arrived at her residence in a brown envelope with drawn-in hearts on it. *Church Aff.* ¶ 12; *Church*

*Dep. III* at 478–79. According to Church, the envelope was addressed to her, and it was a departmental envelope from her Division. *Church Dep. III* at 480. The letter was addressed to "Mysterious Lady"; it was signed from "Taz" but did not specifically address Church by name. *Id.* at 485–86, 488. Church testified that the tape contained references to anal intercourse and her left "tittie." *Id.* at 487–89, 492. On deposition, Church stated that she knew the voice on the tape was Baldwin's and that he stated his name on the tape and the name Taz—according to Church, was his nickname at the jail. *Id.* at 487–88. Church also produced a get well card that she stated was mailed to her. The card was addressed to "Ms. Church" and was from "Baldwin"; it referenced the tape and the letter. *Church Aff.* ¶ 12. Church stated in her affidavit that, when she received these documents at her home, she "realized there was virtually no place to which [she] could retreat from [Baldwin's] improper advances." *Id.*

On deposition, Baldwin admitted (as he had admitted during the 1999 internal investigation of Church's harassment complaints, discussed *infra*) that he wrote the letter and created the audio tape. He testified that he was attempting to establish a romantic relationship with another correctional officer—Shirley Carroll—and that he had prepared the material for Carroll (the "Mysterious Lady"). Baldwin testified that in the summer of 1998, he had brought the material to the workplace in his lunch bag, apparently intending to show the letter to, and play the tape for, Carroll, and then to destroy them. He discovered that they had been removed from his bag by an unknown person; he failed to report the theft because he was embarrassed. In short, Baldwin emphatically denied sending the letter (which, in striking contrast to the vulgarities attributed to Baldwin by Church, contained no

graphically sexual language) and tape to Church. Baldwin also emphatically denied that he wrote the card signed "Baldwin" and which mentioned Church by name. (Church retained a "questioned document examiner" who issued a conclusory report opining that the letter and thank you card were written by Baldwin. While the question of whether Baldwin authored the thank you card is immaterial in the view that I take of the case, based on the expert report submitted by Church with her opposition, it would be surprising if this evidence were admitted at trial. *See generally United States v. Saelee,* 162 F.Supp.2d 1097 ( D.Alaska 2001).)

Church says she called Drewery to discuss the matter but that she was told that he was unavailable. *Church Dep. III* at 495. She also called Commissioner La-Mont Flanagan's office but he was also unavailable. *Id.* at 495–96. Church told Flanagan's secretary about the tape and letter and related to her "in detail" the contents of the tape and letter, including that they stated that Baldwin wanted to have sex with her. *Id.* at 496–98.

F. Church Files a Formal EEOC Charge and the State Immediately Investigates Her Allegations and Finds Her Allegations Against Baldwin Not Proven

In the spring and summer of 1999, Church's on-going disputes over leave, work assignments and grievances related thereto prompted her to write long, rambling complaint letters to a variety of public officials, including the Secretary of the Department, the Governor of Maryland and United States Senators representing Maryland, and others. On or about August 13, 1999, she also wrote a letter (quoted *infra*) to the Equal Employment Opportunity Commission ("EEOC"). On August 16, 1999, Vivian Ferebee, Director of the Minority Business Enterprise/Equal Employment Opportunity Division of the Department of Public Safety and Correctional Services, assigned fair practices investigator Gregory Roberts to investigate two complaints dated May 25, 1999, and May 26, 1999, which Church had filed regarding Drewery and Williams. *Dep. of Vivian Ferebee,* at 17–18 (hereinafter *Ferebee Dep.*); *Church Aff.* ¶ 18; *Roberts Dep.* Ex. 1 (investigative report). These complaints did not remotely focus on (or even mention) alleged sexual harassment; rather, they were concerned with "unfair labor practices" related to leave (and medical documentation for same) and undesirable work assignments ordered by Major Williams. *Ferebee Dep.* at 18; *Roberts Dep.* Ex. 1 (investigative report); *Church Aff.* ¶ 18 (stating that Roberts did not learn of the sexual harassment claim until meeting with Church).

According to Ferebee, the first that any superior within the Department of Public Safety and Correctional Services learned of the sexual harassment allegations against Baldwin was September 10, 1999, when Church faxed to Roberts a copy of the August 13, 1999, letter to the EEOC and a copy of the "Mysterious Lady" letter, among other items. *Ferebee Dep.* at 15; *Aff. of Vivian Ferebee,* Attach. A (hereinafter *Ferebee Aff.*). In the August 13, 1999, letter (which was signed "under penalties of perjury"), Church stated that *she has "not complained to [her] supervisors at the Detention Center about Sgt. Baldwin's conduct, because he is my immediate supervisor and has been employed at the Detention Center for many, many years."* (Emphasis added). She also stated that *she had not "pursued an internal grievance concerning [her] sexual harassment because [she] believ[ed] it [was] pointless, given Sgt. Baldwin's power base in the Detention Center Administration."* (Emphasis added).

In any event, on October 1, 1999, Roberts interviewed Church with her attorney present. Church advised Roberts that she was not interested in pursuing the complaints against Drewery and Williams and instead wished him to pursue the sexual harassment complaint against Baldwin. According to Church, when she met with Roberts and he learned of Baldwin's conduct, he "chuckled." *Church Aff.* ¶ 18. Church states that Roberts told her that he has known Baldwin for years and commented to Church that Baldwin "was up to his old tricks." *Id.* (internal quotation marks omitted).

Roberts interviewed Baldwin on October 4, 1999. Roberts testified that he played the tape, showed Baldwin the letter, and asked him about the allegations of sexual harassment. *Roberts Dep.* at 47–48. As mentioned, Baldwin admitted making the tape and the letter but denied sending them to Church. *Id.* at 47, Ex. 1 (investigative report); *Dep. of Ronald Baldwin* at 18–22 (hereinafter *Baldwin Dep.*). As described above, Baldwin asserted that the tape and the letter were stolen from his possession. *Roberts Dep.* at 47. Absent any corroborating evidence that Baldwin had sent the items to Church, Roberts concluded that there was no "conclusive evidence" that Church had been sexually harassed as alleged. *Id.* Ex. 1 (investigative report). Roberts submitted his report to his supervisor, Ferebee. *Ferebee Dep.* at 33. As a result of the investigation, Assistant Commissioner Sizelove issued Baldwin a letter of counseling on October 22, 1999, and transferred him to BCBIC. *Ferebee Dep.*, Ex. 10.

On October 27, 1999, Church filed a formal charge of discrimination with the EEOC claiming gender-based discrimination, sexual harassment and related retaliation by her employer. Meanwhile, in a letter dated November 1, 1999, Ferebee notified Church that based upon Roberts's

investigation there was no "conclusive evidence" that she experienced sexual harassment in the manner alleged. The letter stated in part:

> Based upon the investigation there is no conclusive evidence that you experienced sexual harassment in the manner alleged. The evidence is clear by Sgt. Baldwin's admission that the materials belonged to him and were stolen from his possession. There is no conclusive evidence that this is not true and that he gave them or sent them to you. There is also no conclusive evidence that any of this occurred in the workplace. You have not alleged any other actions taken by Sgt. Baldwin on the job. There is also no conclusive evidence that you experienced stress around Sgt. Baldwin, since your complaint against Major Williams was in objection to being moved from the area where you worked so closely with Sgt. Baldwin. In addition, it was immediately after the change of assignment initiated by Major Williams that you went out on sick leave and have not returned.

*Ferebee Dep.*, Ex. 3. However, Ferebee told Church that to provide Church with an opportunity to return to work, Baldwin was transferred to BCBIC and assigned to a different shift. *Id.* Church was notified of her ability to appeal this decision to the Office of Personnel Services and Benefits, Employee Relations Division, Department of Budget and Management. *Id.* Church was enormously displeased with the outcome of the investigation, as she stated in her affidavit:

> I was enraged when I later discovered Investigator Roberts' proposed solution would simply be to banish me to another part of the facility, leaving … Baldwin in the same position of authority on the same "turf" he had always occupied. I was even more enraged when I discover-

ed that—as Security Chief Drewery had predicted all along—Investigator Roberts concluded (and his superior, Vivian Ferebee had affirmed) that, because Baldwin denied sexually harassing me, it would simply be impossible to get to the bottom of the matter.

*Church Aff.* ¶ 18.

G. Church Files Suit Against Baldwin in State Court and the Case is "Dismissed With Prejudice" and Judgment is Entered in Favor or Baldwin

On January 3, 2000, Church filed a pro se claim in the District Court of Maryland for Baltimore City against Baldwin seeking $25,000 damages. *See Mem. of Law in Supp. of State Def.'s Mot. for Summ. J.,* Ex. 8. The complaint alleged gender-based discrimination, sexual harassment, and retaliation by her employer, but Church's employer is not named as a defendant. Baldwin retained private counsel and upon his request for a jury trial, the case was transferred to the Circuit Court for Baltimore City. A scheduling order was promptly issued and trial was scheduled for October 12, 2000. On September 21, 2000, Baldwin filed a timely motion for summary judgment, arguing that summary judgment should be granted in his favor because he could not be held liable individually for violations of Title VII.

On October 11, 2000, Church mailed a letter to the circuit court requesting a stay or that the case be dismissed without prejudice. She asserted that the EEOC would be issuing a right to sue letter and Church intended to file suit against defendant in federal court. There is no dispute that Church had retained her present counsel at the time the pro se case was scheduled for trial in state court and that counsel knew about the scheduled trial; indeed, he advised her not to go forward with the state court action. *See Mem. in Supp. of Pl.'s Resp. to State Defs.' Mot. for Summ.* *J.* at 5. Nevertheless, her attorney had not been retained to represent her in the state court case and he never entered his appearance in that proceeding.

On October 12, 2000, Baldwin filed his opposition to Church's request to stay or to dismiss without prejudice, again arguing vigorously in support of summary judgment and against the request for a postponement. When Church failed to appear in court on October 12, 2000, the circuit court judge denied Church's request to stay or to dismiss without prejudice, granted Baldwin's motion for summary judgment, and dismissed the case "with prejudice." The docket entry reads "judgment in favor of defendant for costs." Church filed a motion to alter judgment. On February 5, 2001, the circuit court denied Church's motion to alter judgment.

(Church also caused the State's Attorney for Baltimore City to institute criminal charges against Baldwin in 1999 for indecent exposure and related offenses. Allegedly, Baldwin had exposed himself in the course of his harassment of Church. Baldwin was found not guilty.).

H. Church's Employment is Terminated

After a ten-month absence, Church returned to work at the BCDC on March 1, 2000. *Church Dep. II,* Ex. 37. Even though Baldwin had been transferred, Church testified he was still harassing her in April 2000 when they sometimes met in passing. *Church Dep. III* at 338–40. Church explained how this was possible despite working in different centers: "On several occasions, [Baldwin] would be transporting inmates from central booking down through the tunnel over to WDC [ (where Church was working) ], and he was spotted by [her] on several occasions even though [she] was way down the hall somewhere or passing through." *Id.* at

338–39. On April 17, 2000, Church was transferred from the WDC to the MDC. *Aff. of Lamont W. Flanagan,* Attach. B (hereinafter *Flanagan Aff.*). Church testified that she was transferred because of her "being sexually harassed by Sgt. Baldwin and [she] worked at WDC, his job was to transfer inmates from central booking through the tunnel, which means he had to come through WDC where [she] was working to bring them to main control . . . ." *Church Dep. III* at 342. Sometime after that, in April 2000, Church again went out on leave. *Id.* at 336–38. On deposition, she stated that because of stress, she went out on leave under the "Medical Family Leave Act of 1993." *Id.* at 338. Specifically, Church was on sick leave, due to stress, from April 17, 2000, until April 28, 2000. *Flanagan Aff.* ¶ 6.

On April 19, 2000, Church met with her psychotherapist, Janice Levitt, and her psychiatrist, Dr. Diane Gutterman. *Church Dep. II,* Exs. 37, 38. Levitt wrote a letter (also referred to as a medical certificate) on that date to Church's employer stating that she recommends that Church return to work when "she is secure at a work site without further harassment" and "that it would be in her best interest to return to work as soon as possible, but at the appropriate setting, so that there is a reduction in her anxiety." *Id.* Ex. 38; *Flanagan Aff.* ¶ 6, Attach. C. Gutterman also wrote a letter/medical certificate to Church's employer on April 19, 2000, stating that Church was distressed due to the events with Baldwin, that Church was not provided a safe working environment to return to, and that she recommends that Church not be permitted to return to work until further evaluations had been made. *Church Dep. II,* Ex. 37; *Flanagan Aff.* ¶ 6, Attach. C. Levitt wrote an additional letter/medical certificate on April 20, 2000, stating that she "suggest[s] that Church does not return to work because of Post Traumatic Stress Disorder that has reoc-

curred because of her employers. However, the sooner she can be transferred to the Baltimore Pre–Release Unit the better I would anticipate her recovery." *Church Dep. II,* Ex. 39; *Flanagan Aff.* ¶ 6, Attach. C.

Church submitted these letters/medical certificates to her employer. *Church Dep. II,* Exs. 37, 38, 39; *Flanagan Aff.* ¶ 6. On April 28, 2000, Assistant Commissioner Sizelove met with Church and requested that she sign a release so that the Division could verify the medical documentation from Levitt. *Flanagan Aff.,* Attach. D. Sizelove also explained that Gutterman "had certified the document from her dated April 19, 2000, without requiring a release. [Church] then refused, before a witness, to sign the release." *Id.* By memo dated May 1, 2000, Church was instructed to sign the release agreement. *Id.* She refused to sign. *Id.*

By letter dated April 28, 2000, Church was directed to submit task analyses from Levitt and Gutterman certifying that she was fit to return to duty with no restrictions. *Id.* ¶ 6, Attach. E. From April 29, 2000, through May 1, 2000, Church was permitted to use three days administrative leave. *Id.* ¶ 6. As of May 2, 2000, Church went on leave without pay status. *Id.* On May 8, 2000, Church submitted a task analysis from Levitt, dated May 4, 2000, which indicated that Church was unable to use a firearm due to depression, anger, and elevated anxiety. *Id.* at Attach. F. She also submitted a task analysis from Gutterman, dated May 5, 2000, that likewise indicated that she was unable to use a firearm due to "emotional reasons." *Id.*

In a letter dated May 11, 2000, Sizelove notified Church that as she could not use a firearm, a task critical to her job, she would have to stay on sick leave. *Id.* at Attach. G. The letter asked that Church provide, by May 19, 2000, medical certifi-

cates establishing her prognosis regarding her ability to return to work. *Id.* This letter was sent by certified mail and was returned unclaimed. *Id.* Church, however, did provide a copy of a medial certificate written by Levitt dated May 26, 2000. The certificate stated: "I do not believe that she is recovered enough at this time to use a firearm. She reports tension at the work site that in fact hinders her full recovery." *Id.* at Attach. H. In a letter dated June 6, 2000, Sizelove directed Church to provide by June 12, 2000 "original documentation from Janice Levitt regarding a prognosis for your condition" and documentation from Dr. Gutterman regarding a prognosis for Church's condition. *Id.* at Attach. I. Church failed to meet this deadline. *Id.*

In a letter dated August 22, 2000, Ferebee notified Church's attorney that, as Church had not yet provided the requested medical documentation regarding her prognosis and estimated return to work date, "the Division must refer her to the State Medical Director for evaluation of her ability to perform safely the essential functions of her position." *Id.* at Attach. J. On September 6, 2000, Ferebee sent Church's attorney and Church a second letter extending the deadline to return the necessary documentation for the medical evaluation, which was included in the August 22, 2000, letter, as Church was not sent that first letter. *Id.* By letter dated September 13, 2000, Assistant Attorney General Michele J. McDonald directed Church's attorney that Church must complete the forms necessary for a medical evaluation to determine her ability to perform the essential job functions. *Id.* at Attach. L. Church does not dispute that neither she nor her attorney responded with the proper documentation. *Id.*

By letter dated October 4, 2000, addressed to Ferebee, Levitt indicated that Church related to her that Church self-reported that she trusts in her ability to carry a firearm. *Id.* at Attach. M. The letter also states that Levitt believed that Church had improved significantly and "as self reported" is ready to return to work "as previously agreed upon to the Baltimore Pre–Release Unit .... Returning to work at this site does not threaten her personal nor professional security." *Id.* The letter did not indicate that she could return to the MDC, however. *Id.*

In a letter dated October 19, 2000, Flanagan ordered Church, once again, to complete the medical evaluation documents and to return them to his office by October 27, 2000, so as to schedule an examination by the State Medical Director. *Id.* ¶ 8, Attach. N. This letter was sent by certified mail to Church and copied to her attorney, but was returned to sender marked "won't sign." *Id.* Church does not dispute that she did not comply with this order. *Id.* ¶ 9. In a letter dated October 31, 2000, sent by certified mail to Church and faxed to her attorney, Flanagan requested that Church attend a mitigation conference on November 8, 2000, concerning her failure to submit to a medical examination. *Id.* ¶ 10. The letter was returned to sender. *Id.* ¶ 10, Attach. O. Church does not dispute that she did not attend this conference. *Id.*

Based on Church's repeated failures to provide original documentation concerning her inability to work, her continual refusal to accept mail, certified mail, and federal express instructions and communications from her employer, her failure to complete the paperwork necessary to schedule an examination by the State Medical Director, her insubordination by disobeying a direct order of the Commissioner, and her overall employment, attendance, disciplinary, and work history, Commissioner Flanagan recommended her termination to Secretary Stuart O. Simms. *Id.* ¶¶ 12, 13. Secre-

tary Simms ratified the termination by signing and dating the notice of disciplinary action on November 22, 2000. *Id.* ¶ 14, Attach. P. The notice of termination specifies that reasons for termination were: (1) violating lawful orders; (2) engaging in conduct that has a nexus with an identifiable detriment to the state; (3) preventing employer from ascertaining whether employed is qualified; (4) failing to submit original medical certificate; (5) engaging in conduct unbecoming an officer; (6) failing to obey lawful order; (7) acting insubordinately; and (8) agency has discretion to impose necessary discipline. *Id.*, Attach. P.

Church contends that she was fired in November 2000 on the grounds of submitting insufficient documentation "to support the stress leave necessitated by ... Baldwin's misconduct." *Church Aff.* ¶ 19. Church adds that long before November 2000, "the Division of Corrections had improperly stopped paying [her] or maintaining [her] insurance, which they permitted to lapse without issuance of a COBRA letter or other formality. Meanwhile, it is [her] understanding ... [that Baldwin] has been promoted to Lieutenant, and remains an officer in good standing despite his having apparently perjured himself in his deposition in this case." *Id.*

In the meantime, the EEOC had issued a determination on May 30, 2000, which recited that the State of Maryland

> did violate Title VII of the Civil Rights Act, in that it failed to act on Charging Party's reports of sexual harassment and that it did not take immediate and appropriate corrective action. The evidence also shows that Respondent had knowledge of the harassment sustained by Charging Party but failed to exercise reasonable care, to eliminate the harassment from continuing. The evidence further shows that Charging Party was subjected to a hostile work environment

because of her sex, female. The evidence reveals there is a reasonable cause to believe that Respondent has violated Title VII of the Civil Rights Act, as amended.

*Complaint*, Ex. A. The EEOC recommended that the parties "join with it in a collective effort toward resolution ... through the process of conciliation." *Id.* However, conciliation was unsuccessful. *Id.* On August 1, 2000, the United States Department of Justice, Civil Rights Division, notified Church of her right to sue under Title VII, and this case was timely filed. *Id.*

## IV. ANALYSIS

### A. Title VII Harassment Claim

■ To prevail on a Title VII hostile work environment claim, the plaintiff must establish four elements:

(1) unwelcome conduct,

(2) based on [plaintiff's] gender,

(3) sufficiently pervasive or severe to alter the conditions of employment and to create a hostile work environment, and

(4) some basis for imputing liability to [defendant].

*Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 266 (4th Cir.2001) (citing *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 241 (4th Cir.2000)). The State asks the court to assume for the purposes of its motion, based on plaintiff's deposition testimony, that plaintiff can establish the first three elements of the claim and argues that, nonetheless, it is entitled to summary judgment as plaintiff cannot establish the fourth element of her claim.

■ The evaluation of whether the harassing conduct is imputable to the State is controlled by *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), and *Burlington*

*Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). The Supreme Court held that, under the "aided-by-agency" principle, regardless of the presence of an adverse tangible employment action (described as a significant change in employment status such as discharge, demotion, or undesirable reassignment), "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275. It is important to note that the language is "only 'subject to,' not 'automatically liable,' because not all harassment even by supervisory personnel is necessarily aided by the agency relation." *Mikels v. Durham,* 183 F.3d 323, 331 (4th Cir. 1999) (citing *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275). The Fourth Circuit further explained:

> The fundamental determinant of this form of vicarious liability is not, therefore, the harasser's formal rank vis-a-vis that of the victim in the particular employment hierarchy, though that is of critical and sometimes decisive evidentiary importance, but whether the particular conduct was "aided by the agency relation."

*Id.* at 332 (citations omitted); *Jaudon v. Elder Health Inc.,* 125 F.Supp.2d 153, 161 (D.Md.2000); *see also Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 186 (4th Cir.2001) ("[T]here must be some basis in law for imputing the acts of the supervisor to the employer."). Moreover, any harassing conduct that amounts to a tangible employment action against the victim is necessarily conduct aided by the agency relation because "it can only be taken by supervisory employees empowered by their employers to take such action." *Mikels,* 183 F.3d at 332 (citing *El-*

*lerth,* 524 U.S. at 762, 118 S.Ct. 2257); *Spriggs,* 242 F.3d at 186; *Jaudon,* 125 F.Supp.2d at 161. Under the last circumstance, the employer's liability is absolute. *Mikels,* 183 F.3d at 332.

■ If no adverse tangible employment action resulted from the harassment, then the employer may assert an affirmative defense by proving, by a preponderance of evidence, that (1) the employer exercised reasonable care to prevent and to correct promptly any sexually harassing behavior, and (2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm. *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257. For this affirmative defense to be applicable, "it can only arise from the conduct of an employer having some measure of supervisory authority over the victim; it cannot arise from the conduct of a mere co-worker, one with no authority." *Mikels,* 183 F.3d at 332. Therefore, in instances where there is no tangible employment action but the harasser has some measure of supervisory authority over the victim, the liability of the employer is not absolute as it is subject to the affirmative defense. *Id.* The relationship between the employer and the harasser employee is still subject to an "aided by the agency relation" determination considering "other features of the employment relations between the harasser, victim, and employer and the particular circumstances of its occurrence." *Id.*

■ Finally, if it is determined that the harasser does not fit under the above two categories, in that he has no authority of any kind over the victim, then he is determined to be a co-worker. *Id.* A negligence theory is applied in such a case. *Jaudon,* 125 F.Supp.2d at 161. The employer is only directly liable in such a case if the

employer fails "after, actual or constructive notice, to take prompt and adequate action to stop [the harassment]." *Id.* (quoting *Mikels,* 183 F.3d at 332) (alteration in original) (internal quotation marks omitted).

### 1. Church Suffered No Tangible Adverse Employment Action Causally Related to Sexual Harassment

Thus, in the case at bar, the threshold question is whether "the harassment 'culminated in a tangible employment action,' such as termination." *Jaudon,* 125 F.Supp.2d at 161. If so, as stated *supra,* "the employer's absolute vicarious liability is established without the need to determine, as a factual matter, whether the harasser was aided by the agency relationship." *Id.* (citing *Faragher,* 524 U.S. at 807–08, 118 S.Ct. 2275; *Mikels,* 183 F.3d at 332).

The Supreme Court explained a tangible employment action as follows:

> A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits....
>
> When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation. A tangible employment action in most cases inflicts direct economic harm. *As a general proposition, only a supervisor, or other person acting with the authority of the company, can cause this sort of injury.* A co-worker can break a co-worker's arm as easily as a supervisor, and anyone who has regular contact with an employee can inflict psychological injuries by his or her offensive conduct.... But one co-worker (absent some elaborate scheme) cannot dock another's pay, nor can one co-worker demote another. Tangible employment actions fall within the special province of the supervisor. The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control.
>
> Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates. A tangible employment decision requires an official act of the enterprise, a company act. The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors....
>
> For these reasons, a tangible employment action taken by the supervisor become for Title VII purposes the act of the employer. *Whatever the exact contours of the aided in the agency relation standard, its requirements will always be met when a supervisor takes a tangible employment action against a subordinate.* In that instance, it would be implausible to interpret agency principles to allow an employer to escape liability.

*Ellerth,* 524 U.S. at 761–63, 118 S.Ct. 2257 (emphasis added) (internal citations omitted).

The court in *Jaudon* explained:

> [T]o establish that the harassment 'culminated' in a tangible employment action, plaintiff must establish a causal connection between the harassment and the action.... Intervening circumstances may serve to break the causal connection between the two.

*Jaudon,* 125 F.Supp.2d at 161(citing *Johnson v. West,* 218 F.3d 725, 731 (7th Cir. 2000); *Burrell v. Star Nursery, Inc.,* 170 F.3d 951, 956 (9th Cir.1999); *Fierro v. Saks Fifth Avenue,* 13 F.Supp.2d 481, 491

(S.D.N.Y.1998)). The Fourth Circuit has explained that the tangible employment action must be taken for a discriminatory reason. *Lissau v. Southern Food Serv., Inc.,* 159 F.3d 177, 182 (4th Cir.1998); *see also Ellerth,* 524 U.S. at 753–54, 118 S.Ct. 2257 ("When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII."); *Spriggs,* 242 F.3d at 186 (same).

In her amended complaint, Church alleges that she was subject to "adverse personnel actions prompted ... by her refusal to submit to Sgt. Baldwin's advances," *Am. Compl.* ¶ 15, including a reprimand for abusing sick leave in June 1999, "stopping her wages, withholding her insurance benefits and ultimately firing her." *Id.; Pl.'s Answer to Interrog.* No. 10. Analysis of the summary judgment record shows that Church has utterly failed to support her bald allegations with substantial evidence.

### i. *Reprimand*

■ The State first contends that plaintiff's reliance on the June 1999 reprimand is misplaced as it does not constitute a tangible employment action within the contemplation of *Faragher* and *Ellerth, supra.* I agree with the State on this point. Such a reprimand simply does not implicate a significant change in employment status, particularly as the reprimand in question was rescinded by hearing officer, James Berger, who directed that Church's leave be restored. *Dep. of John Price* at 16–17; *Roberts Dep.,* Ex. 1. More importantly, the reprimand was not a result of Baldwin's sexual harassment of Church and was not done at the hands of Baldwin, the alleged harasser.

### ii. *Suspension of Wages*

■ Church's claim that the State's suspension of her wages amounts to a tangible employment action resulting from the sexual harassment also fails. Any wage loss was not a result of sexual harassment as there were dispositive intervening circumstances, and the wage loss cannot be tied to the harassment. *Cf. Murray v. Chicago Transit Auth.,* 252 F.3d 880, 888 (7th Cir.2001) (determining that the plaintiff failed to establish a tangible employment action because she could not tie the actions to the alleged sexual harassment).

Church ceased to receive wages and benefits after May 2, 2000, because she failed to provide medical documentation that would authorize her use of accrued sick leave, thereby entitling her to receive wages and benefits. *See supra.* According to Maryland's State Personnel and Pensions Code § 9–504, the use of sick leave for "5 or more consecutive workdays for personal illness or disability ... may not receive payment under this subtitle unless the employee gives the employee's immediate supervisor an original certificate of illness or disability." MD. CODE ANN., STATE PERS. & PENS. § 9–504 (1997). As explained at length *supra,* after May 2, 2000, Church was placed on leave without pay pending her submission of original medical certificates that included the required prognosis. *See* § 9–504(c) ("The certificate required under subsection (a) of this section due to an employee's illness or disability shall include a prognosis about the employee's ability to return to work."). Church did provide the requested task analyses on May 8, 2000, indicating that she was unable to carry a firearm; however, these documents did not indicate how long Church would be unable to carry a firearm and whether she would be able to meet this essential job function. By certified letter dated May 11, 2000, Assistant

Commissioner Sizelove instructed Church to submit original medical certificates that included a prognosis about her expected ability to return to work. The letter was returned unclaimed.

On May 29, 2000, Sizelove received a facsimile from Janice Levitt stating that Church should still not be permitted to use a firearm. Sizelove subsequently directed Church to provide original documentation from both of her health care providers addressing her expected ability to return to work. Plaintiff simply did not respond. Therefore, it is clear that the harassment did not culminate in the loss of wages in light of the multitude of intervening circumstances. Church's loss of pay was not proximately caused by Baldwin's harassment. Rather, Church was on leave without pay status because she repeatedly failed to provide the required documentation that would have entitled her to continue to use sick leave.

The State points out that, as of May 2, 2000, Church had exhausted all of her sick leave, 20.7 hours, that she had accrued since returning to work on March 1, 2000. *Dep. of Delores C. Jackson* (fiscal accounts clerk manager and supervisor of the payroll department of DPDS). Church was granted three days of administrative leave to cover her absence from April 29 through May 1, 2000, while she obtained the necessary documentation. She exhausted this leave. As of May 2, 2000, Church did have 6.5 hours remaining of accrued annual leave and 8.0 hours remaining personal leave, which may also be used to cover an absence for medical reasons when sick leave has been exhausted. In this case, however, Church did not submit original medical documentation that would have entitled her to take sick leave and had not complied with Sizelove's instruction to obtain the necessary medical documentation, which resulted in her status without pay.

In the fall of 1999, Church did not have sufficient leave to cover her absences. The Department granted Church 576 hours (72 days) of sick accident leave between November 18, 1998 and February 28, 1999, which was not deducted from Church's accrued sick leave. *Dep. of Delores C. Jackson.* However, Church exhausted her accrued sick leave on May 28, 1999, and remained absent on leave without pay. *Id.* Church received a total of 400 hours donated sick leave from July 3, 1999, to September 7, 1999, and again from October 6, 1999, to October 19, 1999. *Id.* Thereafter, Church was on leave without pay from October 20, 1999 to March 1, 2000. *Id.* Again, this instance of loss wages was not a result of the harassment and cannot be tied to the harassment. Church simply did not have sufficient leave to cover her extended and frequent absences.

### iii. *Termination*

■ The State concedes that termination constitutes a tangible employment action. However, it correctly argues that, as a matter of law, Commissioner Flanagan did not terminate Church as a direct result of Church's refusal of Baldwin's advances and therefore the termination does not amount to an adverse tangible employment action that imputes the harassment to the State. Rather, according to the unrebutted Flanagan affidavit and its supporting exhibits, Flanagan acted in accordance with the disciplinary provisions of § 11–106 of the Annotated Code of Maryland, State Personnel and Pensions. The relevant statute is clear. Section 11–106 states, in pertinent part:

(a) *Procedure.*—Before taking any disciplinary action related to employee misconduct, an appointing authority shall:

(1) investigate the alleged misconduct;

(2) meet with the employee;

(3) consider any mitigating circumstances;

(4) determine the appropriate disciplinary action, if any, to be imposed; and

(5) give the employee a written notice of the disciplinary action to be taken and the employee's appeal rights.

MD. CODE ANN., STATE PERS. & PENS. § 11–106 (1997).

Church repeatedly failed or refused to provide original medical documentation concerning her ability to work. *Flanagan Aff.* ¶ 6; *see supra.* She demonstrated a disregard for the legitimate operational needs of her employer by refusing to accept any communications or instructions from its managers, whether by regular mail, certified mail, or federal express. *Flanagan Aff.* ¶¶ 6–13, Attachs. N, O; *see supra.* On deposition, Church stated that she did not receive the letters from Commissioner Flanagan. *Church Dep. III* at 735–46. She did admit that she had seen some of the letters before and that she received some of the letters or was notified of their content from her attorney. *Id.* Church also failed or refused to complete the paperwork necessary to schedule an examination by the State Medical Director. *Flanagan Aff.* ¶¶ 6, 8; *see supra.* Church was provided a multitude of opportunities to demonstrate that she was psychologically stable to handle a firearm, but she consistently failed to provide the requested documentation and failed to schedule and submit to an examination by the State Medical Director over a period of several months. *Flanagan Aff.* ¶ 6. Church also admitted that she did not obey a direct order of Commissioner Flanagan to submit to examination by the State Medical Director and remarked in regards to the same, "I mean what is the big deal?" *Church Dep. III* at 735–41. Commissioner Flanagan concluded:

Based on Ms. Church's repeated failure to provide original medical documentation concerning her alleged inability to work, her continued refusal to accept mail, certified mail and federal express instructions and communications from her employer, her failure to complete the paperwork necessary to schedule an examination by the State Medical Director, her insubordination by disobeying my direct order to complete this paperwork and return it to my office, and her overall employment, attendance, disciplinary and work history, I recommended her termination to Secretary Stuart O. Simms.

*Flanagan Aff.* ¶ 13. In reaching this conclusion, Commissioner Flanagan studied a detailed list of her employment history, attendance history, disciplinary and counseling history, overall work habits and relations with others. *Aff. of Lamont W. Flanagan* ¶ 12. Secretary Simms then ratified the termination by signing and dating the notice of disciplinary action on November 22, 2000. *Id.* ¶ 14, Attach. P.

The *only* argument and reference that Church makes in response to defendant's evidence is paltry, indeed: "Plaintiff suffered adverse tangible employment action imposed for discriminatory reasons, including withholding of pay and insurance benefits and termination." *Mem. in Supp. of Pl.'s Resp. to State Defs.' Mot. for Summ. J.* at 11. In her affidavit, Church stated that the Division of Corrections "then added injury to insult by firing me on the grounds I had submitted insufficient documentation to support the stress leave necessitated by Sgt. Baldwin's misconduct. My termination occurred in November of 2000; long before then, the Division of Corrections had improperly stopped paying me or maintaining my insurance." *Church Aff.* ¶ 19. These statements are simply not enough to refute defendant's contentions that there was no adverse

tangible employment action taken by the State that proximately culminated from, or were caused by, or were directly related to, the harassment. The harassment (and the consequent need, according to Church, for her to be absent from the job) was at best a remote backdrop to her extant health difficulties. Rather than proximately arising from the harassment, as a matter of law, Church's termination was a result of intervening circumstances, which in this case amounted simply to Church's failure to follow well-settled procedure and clear and unambiguous orders.

### iv. *Benefits*

■ Finally, Church raises a new alleged adverse employment action in her affidavit. Church alleges that long before her termination, "the Division of Corrections had improperly ... permitted to lapse without issuance of COBRA letter or other formality." *Church Aff.* ¶ 19. I will disregard this allegation as it was raised for the first time in Church's affidavit accompanying her opposition for summary judgment. *Cf. Bagrowski v. Maryland Port Authority,* 845 F.Supp. 1116, 1121 (D.Md.1994) ("Plaintiffs assert this claim ... for the first time in their opposition to defendants' summary judgment motion. Discovery has long since closed, and it is far too late for plaintiffs to raise this claim now."); *Deghand v. Wal–Mart Stores, Inc.,* 926 F.Supp. 1002, 1015 (D.Kan.1996) ("The defendant objects to the new facts and issues first alleged in the plaintiff's response to the summary judgment motion. The court sustains the defendant's objection, as these allegations have not been properly pleaded and appear to be offered now only in an effort to avoid summary judgment." (Citations omitted)).

Accordingly, for the above reasons, I conclude that the State is not vicariously liable as there has been no adverse tangible employment action on its part that was caused by Baldwin's alleged sexual harassment of Church.

### 2. Baldwin's Harassment of Church is Not Otherwise Imputable to the State

■ Because no tangible employment action resulted from the harassment, to impute liability to the State, Church must project evidence tending to establish that the agency relationship aided Baldwin's alleged harassment of her. The State argues that Church cannot demonstrate that Baldwin was aided by the agency relationship as Baldwin did not act as her supervisor. The State further contends that Baldwin did not have the authority to take tangible employment action against Church and the State of Maryland does not label a correctional sergeant, such as Baldwin, a supervisor. Church argues, without citing to any case law, that there is a question of material fact regarding whether Baldwin acted as her supervisor, stating that "Baldwin in fact exercised supervisory functions over her, making shift and scheduling assignments, making input in her performance evaluations and directing or attempting to direct her conduct in the workplace." *Mem. in Supp. of Pl.'s Resp. to State Defs.' Mot. for Summ. J.* at 7. Church further argues that "Baldwin was [her] immediate supervisor, performing [her] evaluations and generally serving in all respects as [her] boss," *Church Aff.* at ¶ 2, and that (and this is the extent of her legal argument regarding whether Baldwin was her supervisor) "a factual dispute exists as to the extent of supervisory authority exerted by Sgt. Baldwin over Ms. Church, a dispute as to which Ms. Church is entitled to all beneficial inferences." *Id.* I agree with the State for the following reasons.

### i. Baldwin Was Not Aided By Agency

■ To determine whether Baldwin was aided by the agency relationship, "the

details of the relationships and the particular circumstances must be examined." *Jaudon,* 125 F.Supp.2d at 162 (citing *Mikels,* 183 F.3d at 333). Moreover,

> [t]o establish the "agency aided" theory, a plaintiff must show that the "employment relation to the victim was such as to constitute a continuing threat to her employment conditions that made her vulnerable to and defenseless against the particular conduct in ways that comparable conduct by a co-worker would not."

*Id.* (quoting *Mikels,* 183 F.3d at 333). Furthermore,

> the most powerful indicator of such a threat-induced vulnerability deriving from the supervisor's agency relation lies in his authority, though not exercised in a particular situation, to take tangible employment actions against the victim such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.

*Id.* (internal quotation marks omitted) (quoting *Mikels,* 183 F.3d at 333).

Manifestly, Baldwin did not have the power or authority to effect a tangible employment action-"hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits"—as to Church. Baldwin was essentially a timekeeper. As a timekeeper, he was responsible for maintaining the shift rosters, placing the officers who are scheduled to work on the roster, determining the need for additional officers, monitoring the operations of the control center, checking in officers reporting for duty, ensuring the cleanliness of the control center in their assigned area, developing the next day's roster in consultation with the duty captain or shift commander, and writing a matter of record for any officer who failed to report or was late. *Dep. of John Price* at 39–41 (July 13, 2001) (hereinafter *Price Dep.*); *Dep. of Sergeant Ronald Baldwin* at 91–93 (July 11, 2001). From this job description, it is clear that Baldwin had no authority to hire, fire, promote, reassign, or otherwise effect a significant change in benefits. Moreover, Church admitted that Baldwin lacked the authority to develop a post schedule without having the duty captain and major review it. *Church Dep. I* at 182.

Additionally, Baldwin did not hold a position considered to be an official supervisor position. The State of Maryland, through its classification system and through collective bargaining, has determined that a correctional sergeant is not a supervisor within state service. The Department of Budget and Management has designated correctional sergeant (Baldwin's then position) as a nonsupervisory position and assigned it to bargaining unit H for the purpose of collective bargaining, whereas the Department has excluded supervisory positions from collective bargaining. *Aff. of Esther Scaljon* ¶¶ 3–4 (Executive Director of the Human Resources Services Division of the Maryland Department of Public Safety and Correctional Services).

Furthermore, the authority to appoint, promote, transfer, reassign, discipline, and terminate employees, under the appointing authority's jurisdiction, is vested, as a matter of law, in the Commissioner of the division. MD. CODE ANN., STATE PERS. & PENS. §§ 7–209, 7–602, 11–104 (1997). The Commissioner of a division, in this instance, Lamont W. Flanagan, is the appointing authority. *Flanagan Aff.* ¶ 4 ("As the Commissioner, I am the appointing authority for the Division and possess the statutory authority to appoint and terminate employment, impose disciplinary actions, reassign, transfer, and promote employees."). Therefore, as Baldwin did not

hold the position of Commissioner, he was unable to perform those actions. Commissioner Flanagan delegated the authority to impose disciplinary actions to [his] supervisory staff as follows:

the Deputy Commissioner and Special Assistant to the Commissioner have the authority to issue reprimands and suspensions and to propose for [his] consideration the termination of an employee; the Personnel Director, Warden, Assistant Wardens, Security Chiefs, as well as the Director and Deputy Director of the Pretrial Release Services Program have the authority to issue reprimands and suspensions.

*Id.* ¶ 5, Attach. A. Baldwin's position was not delegated any of these duties.

The State notes that Baldwin did have some leadership responsibilities. Assistant Warden Price explained:

[C]orrectional Sergeant is not a supervisor in the state system, per se. Every correctional officer does supervision work. That's what correction is about. Sergeant ... [is] referred to as [a] lead person[ ]. It means that they are knowledgeable. That they have been around in some cases and have been recognized by their supervisors as being able to train and instruct, and direct other correctional officers. They do this, but they are limited in some of the things that they do. Only a correctional lieutenant or above can do certain things that a correctional sergeant [sic] ... is not allowed to do within the state system.

*Price Dep.* at 41–42. Simply because Baldwin may have had some leadership responsibility does not lead to the conclusion that the State is liable. *See Mikels,* 183 F.3d at 331 (explaining that "not all harassment even by supervisory personnel is necessarily aided by the agency relation" (internal quotation marks omitted) (citations omitted)).

The facts of this case are similar to those in *Jaudon, supra.* The court in *Jaudon* determined that the while the evidence established that the alleged harasser had "some level of supervisory authority over the plaintiff, there was no evidence of record that any actions he could take by himself would cause an employee to have 'significantly different responsibilities' or a 'significant change in benefits.'" *Jaudon,* 125 F.Supp.2d at 162 (quoting *Mikels,* 183 F.3d at 333); *see also Bissell v. Reno,* 74 F.Supp.2d 521, 533 (D.Md.1999) (determining that an employee, who allegedly harassed the plaintiff, sometimes acted as plaintiff's supervisor, but that "[the degree of supervisory authority shown by the record] is not sufficient, as a matter of law, to invoke strict employer liability for harassment committed by a supervisor" (citations omitted)). Moreover, the present case does not involve facts such as those in *Faragher, supra,* in which the supervisors had "virtually unchecked authority over subordinates," directly controlled their activities, and the victim was isolated from higher management. *Faragher,* 524 U.S. at 808, 118 S.Ct. 2275.

This case is also similar to that of *Mikels,* in which the Fourth Circuit stated that

it is evident that any authority possessed by [the employee] over [the plaintiff] was at best minimal. In the typical *paramilitary* structure of the Police Department he was, as [the plaintiff] puts it ... only her "superior" in rank, [the employee] a corporal, [the plaintiff] a private level member of the same squad. In that position [the employee's] authority assuredly did not include the power to take tangible employment actions against [the plaintiff] and [the plaintiff's] rank-peers.

*Mikels,* 183 F.3d at 334 (emphasis added). In this case, it is clear from the Division's paramilitary structure, and from Baldwin's

duties and responsibilities as timekeeper, that he did not function as Church's supervisor as he lacked the authority to issue discipline, to reassign or transfer her from the BCDC, or to effect a significant change in her benefits.

The Fourth Circuit has provided an additional avenue of inquiry for situations in which the supervisory power of the alleged harasser over the plaintiff is ambiguous. The court stated that "where the level of authority had by a harasser over a victim—hence her special vulnerability to his harassment—is ambiguous, the tip-off may well be in her response to it. Does she feel free to 'walk away and tell the offender where to go, or does she suffer the insufferable longer than she otherwise might?'" *Mikels,* 183 F.3d at 333 (citation omitted). The circumstances in the present case are not ambiguous, but even if they were, it is clear that Church felt she could walk away and tell Baldwin "where to go." *Cf. Jaudon,* 125 F.Supp.2d at 163 (determining that the plaintiff did not have "any sense of special vulnerability of defenselessness deriving from whatever authority" the alleged harasser possessed as the plaintiff warned her harasser that she would report him). On numerous occasions, Church told Baldwin "no" in response to his assertions and pushed him away. *See, e.g., Dep. I* at 198. Moreover, Church "was not isolated from the continuing protective power of higher management in the" Division. *Mikels,* 183 F.3d at 334. Indeed, on this issue, Church's deposition testimony that she "wanted to kick [Baldwin's] ass" sheds revealing light on her state of mind at the relevant period. *Church Dep. I* at 68.

As noted *supra,* the full extent of Church's opposition is her bald assertion that Baldwin served as her boss. (Church cites to an affidavit in a companion case in which Church claims that a coworker states that Baldwin acted as his boss. However, neither Church, nor the State, nor Baldwin has provided this affidavit with their papers, and I will not consider this averment.) This conclusory assertion does not create a factual dispute. The Fourth Circuit explained that in a motion for summary judgment

> the nonmoving party must produce "specific facts showing that there is a genuine issue for trial," rather than resting upon bald assertions of his pleadings.... Genuineness [(a requisite inquiry when considering a motion for summary judgment)] means that evidence must create a fair doubt; wholly speculative assertions will not suffice. A trial, after all, is not an entitlement. It exists to resolve what reasonable minds would recognize as real factual disputes.

*Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985) (citations omitted); *see also Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.... Unsupported speculation is not sufficient to defeat a summary judgment motion." (internal quotation marks omitted) (citations omitted)); *id.* ("Recent cases of the Supreme Court have made increasingly clear, however, the affirmative obligation of the trial judge to prevent 'factually unsupported claims and defenses' from proceeding to trial." (quoting *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548)). Church has clearly not provided *any* facts to demonstrate that Baldwin was her boss in the manner required to impute liability to the State; Church has not even offered any evidence relating to the functions that Baldwin performed. Consequently, there is no question as to what functions Baldwin performed, which would amount to a question of material fact, but, rather the question is whether those functions were sufficiently supervisory in nature to impute liability to defendants, an

issue that may be resolved by a court on summary judgment.

### ii. The State Has Established Its Affirmative Defense As A Matter of Law

Even if there were evidence that the alleged harassment was aided by the agency relation, the State would prevail on its motion for summary judgment because it has established the affirmative defense recognized in *Faragher* and *Ellerth*, which is available where the harassment is aided by the agency relation but does not culminate in tangible employment action. (As was discussed, there was no tangible employment action.)

▇ The first question is whether defendants exercised reasonable care to prevent and to correct promptly any alleged sexually harassing behavior. "An employer's adoption of an effective anti-harassment policy is an important factor in determining whether it exercised reasonable care to prevent any sexually harassing behavior." *Smith v. First Union National Bank*, 202 F.3d 234, 244 (4th Cir.2000); *Brown v. Perry*, 184 F.3d 388, 395 (4th Cir.1999); *Jaudon*, 125 F.Supp.2d at 163. The Supreme Court explained:

> while proof that an employer had promulgated an antiharassment policy with complaint procedures is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense.

*Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257. The Fourth Circuit further applied the Supreme Court's teaching in *Brown v. Perry*, 184 F.3d 388. In *Brown*, the Fourth Circuit held that any anti-harassment policy that an employer adopts must be "both reasonably designed and reasonably effectual." *Perry*, 184 F.3d at 396; *see First Union Nat'l Bank*, 202 F.3d at 244. "The employer prevailed on the first

element of its affirmative defense in *Brown* because the plaintiff did not provide evidence that the employer adopted the policy in bad faith or that the policy was 'otherwise defective or dysfunctional.'" *First Union Nat'l Bank*, 202 F.3d at 244–45 (quoting *Perry*, 184 F.3d at 396).

▇ The State contends that the State of Maryland and the Department of Public Safety and Correctional Services have an anti-harassment policy that is both reasonably designed and reasonably effectual; and that the agency took reasonable care to prevent and to correct promptly any alleged sexually harassing behavior. Church does not provide a coherent argument in opposition. Rather, Church argues, without further explanation, that "the question of whether the State exercised reasonable care to prevent and promptly correct any alleged sexual harassment is disputed and must be reserved to the trier of the fact." *Mem. in Supp. of Pl.'s Resp. to State Defs.' Mot. for Summ. J.* at 8. Church does not argue that the State's anti-harassment policy was in any way defective. As the Fourth Circuit stated in *Brown*, where "there is no evidence that an employer adopted or administered an anti-harassment policy in bad faith or that the policy was otherwise defective or dysfunctional, the existence of such a policy militates strongly in favor of a conclusion that the employer 'exercised reasonable care to prevent' and promptly correct sexual harassment." *Perry*, 184 F.3d at 396 (citations omitted). This latter assertion is true in the present case, and, therefore, I agree with defendants.

It is plain that the State exercised reasonable care to prevent and to correct promptly any alleged sexually harassing behavior. The agency implemented its anti-harassment policy as soon as it learned of the harassment, and took sufficient remedial action. Moreover, the addi-

tional evidence of reasonableness of the State's corrective action is ample. *Cf. Jaudon,* 125 F.Supp.2d at 163 (discussing, in conjunction with the first element of the affirmative defense, how after the sexual harassment complaint was rendered, the defendant promptly investigated the complaint). Church, and her attorney, attended a meeting with the Fair Practices Investigator on October 1, 1999. By October 4, 1999, Investigator Roberts had also interviewed Baldwin, who admitted to making the tape and letter, but denied sending them to Plaintiff, and further denied harassing Church. Once Baldwin admitted making the tape and letter, Assistant Commissioner Sizelove counseled Baldwin and transferred him from BCDC to BCBIC to enable Church to return to work without the presence of the alleged harasser. Ferebee testified that Baldwin was moved as a preventative measure so that when Church returned to work, the work environment would be free of any potential harassment. *Ferebee Dep.* at 48–49, 52–53. Therefore, as a matter of law, the State took prompt remedial action after the reporting of the harassment.

Moreover, the sexual harassment policy of the State of Maryland and the Department of Public Safety and Correctional Services clearly identifies the prohibited conduct, assures employees who make complaints that they will be protected against retaliation, describes in detail the complaint process, identifies several places where a complaint may be filed, and provides for the prompt investigation of the complaint and equally prompt remedial action. *Aff. of E. Ray Henderson* (Director of Correctional Entrance Level Training for the Maryland Police and Correctional Training Commission), Attach. (hereinafter *Henderson Aff.*).

Under the Department's policy, a complaint may be filed, verbally or in writing, with the Department's Fair Practices Offi-cer (in this instance, Ferebee, *see Ferebee Aff.,* ¶ 1), an immediate supervisor or any management representative chosen by the employee, the Employee Relations Division of the Department of Budget and Management, the Maryland Human Relations Commission, or the Equal Employment Opportunity Commission. *Id.; Dep. I,* Ex. 4. Probationary correctional officers receive training on the Department's policy at the Correctional Training Academy. *Henderson Aff.,* Attach. (Church testified that she had never seen the departmental policy implementing the executive order on fair employment practices dated January 14, 1998, but that she had seen the last page referring to the policy on sexual harassment and produced it as part of her document production. *Church Dep. I* at 253–56, Ex. 4.) Moreover, supervisors go through periodic sexual harassment training. *Ferebee Aff.* ¶¶ 3–4. The institution and enforcement of a sexual harassment policy, coupled with an "adequate complaint procedure," training on the policy and complaint procedure for all incoming officers at the correctional training academy, and periodic training for supervisors (denoted as lieutenants and above) on the sexual harassment policy and procedures by the Department's EEO office demonstrate that the State exercised reasonable care to prevent sexual harassment.

 As for the second element of the defense, the record shows that, as a matter of law, Church unreasonably failed to take advantage of the State's preventative and corrective measures and failed otherwise to act so as to avoid harm. The Fourth Circuit has recently stated:

> The law against sexual harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists.... An employee's sub-

jective belief in the futility of reporting a harasser's behavior is not a reasonable basis for failing to take advantage of any preventive or corrective opportunities provided by the employer.

*Barrett v. The Applied Radiant Energy Corp.*, 240 F.3d 262, 268 (4th Cir.2001) (citations omitted) (internal quotation marks omitted). Furthermore, an employer can prove the second element by demonstrating that the "plaintiff employee unreasonably failed ... to avoid harm otherwise." *Perry*, 184 F.3d at 397 (internal quotation marks omitted) (alteration in original) (quoting *Faragher*, 524 U.S. at 807–08, 118 S.Ct. 2275).

 For the reasons set forth *infra*, it is clear that Church's self-serving, contradictory testimony, and her blatant use of fraudulent documents, must be rejected by a reasonable person with regard to the issue of if and when she complained prior to the August 13, 1999, letter to the EEOC. Before then, from 1997 until 1999, Church unreasonably failed to take advantage of the harassment policy set in place for redress; simply believing that her reporting attempts would be futile is not a sufficient excuse not to complain to someone regarding the sexual harassment. Again, once defendants became aware of the sexual harassment, they took proper remedial action, and thus defendants "are not required to establish the second element of the affirmative defense ... to validly invoke the defense." *Jaudon*, 125 F.Supp.2d at 164. Having established its prompt and adequate remedial response, defendants have established the affirmative defense as a matter of law. Therefore, even if Church could establish that Baldwin's conduct was aided by the agency relationship, summary judgment for the State would be appropriate.

iii. As a Matter of Law, Church's Contradictory Statements Under Penalty of Perjury Regarding Her Complaints About Harassment by Baldwin Defeat Her Contention that The State Had Notice in 1997 of Co–Employee Harassment

 As I explained in *Bissell v. Reno, supra,* the standard for analyzing Church's harassment claim under the test for employer liability for coworker harassment is the following:

> [W]hen an employer knows about racial harassment between co-employees it will be found liable for it unless it can show that it took "prompt and adequate remedial action." ... The remedial actions should be "reasonably calculated to end the harassment." ... "The adequacy of [the defendant's] remedy is a question of fact which a court may not dispose of at the summary judgment stage if reasonable minds could differ as to whether the remedial action was reasonably calculated to end the harassment." ...

*Bissell*, 74 F.Supp.2d at 533 (third alteration in original) (internal quotation marks omitted) (citations omitted).

As the State points out, it is undisputed that defendants acquired actual knowledge of the alleged harassment when Church faxed a copy of the August 13, 1999, letter to the EEOC to the Fair Practices Investigator on September 10, 1999, and subsequently agreed to meet the Fair Practices Investigator on October 1, 1999. *Ferebee Aff.* ¶ 5, Attach. A. By October 4, 1999, the investigator also interviewed Baldwin, who admitted to making the tape and the letter but denied sending them to Church. *See supra.* On October 22, 1999, Assistant Commissioner Sizelove counseled Baldwin and transferred him from BCDC to BCBIC. *Ferebee Dep.*, Ex. 10. It is clear that defendants took prompt remedial action after the harassment had been report-

ed. *See Naylor v. City of Bowie,* 78 F.Supp.2d 469, 478 (D.Md.1999) (determining that the transfer of an alleged harasser so that the parties would not work together was sufficient remedial action). *Cf. Brown,* 184 F.3d at 397 (concluding that the issuance of a restraining order and a thirty day suspension constituted adequate corrective measures where a supervisor grabbed and kissed an employee on two occasions).

Church also claims that the harassment continued after Baldwin was transferred, but there is no testimony that she complained about this additional harassment. Therefore, defendants had no knowledge of this subsequent harassment. Moreover, Church admits that she was transferred from the WDC to the MDC to decrease the possibility that Church would meet Baldwin during their respective work days. Defendants' immediate investigation of Church's complaint, the subsequent counseling, and the transfer of Baldwin were adequate remedial measures, promptly implemented, designed to prevent harassment and to enable Church to return to work. *Cf. Brown,* 184 F.3d at 397 (finding that the defendant employer took reasonable actions to correct an employee's sexually harassing behavior in part because of the restraining order on the alleged harasser, the employer's prompt investigation of the alleged harasser, and the employer's support for the employee who allegedly was harassed).

▮ The question remains regarding the probative value of the evidence that, on numerous occasions, Church complained about the harassment prior to her August 13, 1999, letter to the EEOC, which she faxed to the State on or about September 10, 1999. The State argues that "[a]n assessment of these 'complaints' requires the court to credit testimony that not only is factually impossible but contrary to [Church's] sworn statements." *Mem. of Law in Supp. of the State Def.'s Mot. for Summ. J.* at 29. Church does not substantially address this argument in her opposition; she cites to no case law nor to any specific passages from her affidavit, depositions, or answers to interrogatories. Rather, she supplies only the following argument:

> Contrary to Defendants' assertion, a factual dispute also exists as to whether the State-in the person of higher management-had actual or constructive knowledge of Sgt. Baldwin's actions. In her Affidavit, and her Answers to Interrogatories and in her deposition testimony, Ms. Church asserted high levels of management were informed of Sgt. Baldwin's misconduct almost immediately, beginning in 1997. Although Defendants *challenge Ms. Church's assertions, and question her credibility, such issues are classically left to the trier of fact for resolution.* For similar reasons, the question of whether the State exercised reasonable care to prevent and promptly correct any alleged sexual harassment is disputed and must be reserved to the trier of fact.

*Mem. in Supp. of Pl.'s Resp. to State Defs.' Mot. for Summ J.* at 8.

▮ The Fourth Circuit has stated that "[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." *Halperin v. Abacus Tech. Corp.,* 128 F.3d 191, 198 (4th Cir.1997) (alteration in original) (internal quotation marks omitted) (quoting *Barwick v. Celotex Corp.,* 736 F.2d 946, 960 (4th Cir.1984)); *see Rohrbough v. Wyeth Labs., Inc.,* 916 F.2d 970, 975–76 (4th Cir.1990) ("Given the conflicts between Dr. Cox's affidavit and his deposition testimony, the district court was left not with a genuine issue of material fact, but with trying to determine which of sev-

eral conflicting versions of Dr. Cox's testimony was correct." (citation omitted)).

Other circuits have reached a similar conclusion. For instance, in *Sports Racing Servs., Inc. v. Sports Car Club of America, Inc.*, 131 F.3d 874, 893 (10th Cir.1997), the court stated that there is

> authority for the proposition that in determining whether a material issue of fact exists, an affidavit may not be disregarded because it conflicts with the affiant's prior sworn statements, but concluded that in cases where the affidavit constitutes an attempt to create a sham fact issue, a court may disregard the affidavit.... The court stated that the factors relevant to the existence of a sham fact issue include whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain.

(citation omitted) (internal quotation marks omitted); *see Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir.1997); *Russell v. Acme–Evans Co.*, 51 F.3d 64, 67–68 (7th Cir.1995); *Hayes v. New York City Dep't of Corrections*, 84 F.3d 614, 617–18 (2d Cir.1996); *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1364–65 (8th Cir.1983). The Tenth Circuit explained that the reason for such a standard is "that the utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony." *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir.1986) (citation omitted).

"The reason for this rule is simple: 'If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'" *Halperin*, 128 F.3d at 198 (quoting *Celotex Corp.*, 736 F.2d at 960).

The Seventh Circuit has elaborated this principle:

> An affiant's prior statements cannot be equated to either a deposition, which is under oath ... or to a judicial admission, as in a pleading, which is binding.... It is merely an evidentiary admission, or prior inconsistent statement, which does not bind the witness.... The opposing party can use it to try to discredit the witness's testimony, but the witness may be able to explain it away. And since a number of judicial opinions say that testimony cannot be rejected as incredible as a matter of law (that is, without need for a trial) *unless it contains assertions that are contrary to the laws of nature ...*, it may seem to follow that mere evidentiary admissions (as distinct from depositions) contradicted by an affidavit could never be a basis for a grant of summary judgment to the opposing party because the jury might believe the affiant when he repeated the affidavit in oral testimony. We disagree.

*Seshadri v. Kasraian*, 130 F.3d 798, 801 (7th Cir.1997) (citations omitted) (emphasis added); *see Bright v. QSP, Inc.*, 20 F.3d 1300, 1305 (4th Cir.1994) ("It is well-established that 'even if the post-pleading evidence conflicts with the evidence in the pleadings, admissions in the pleadings are binding on the parties and may support summary judgment against the party making such admissions.'" (quoting *Missouri Hous. Dev. Comm'n v. Brice*, 919 F.2d 1306, 1315 (8th Cir.1990))), *cert. denied*, 513 U.S. 875, 115 S.Ct. 202, 130 L.Ed.2d

133; *Davis v. A.G. Edwards And Sons, Inc.,* 823 F.2d 105, 108 (5th Cir.1987) ("Factual assertions in pleadings are ... judicial admissions *conclusively* binding on the party that made them." (internal quotation marks omitted) (alterations in original) (quoting *White v. ARCO/Polymers,* 720 F.2d 1391, 1396 (5th Cir.1983))).

The *Kasraian* court explained that the "laws of nature formulation is an exaggeration designed to underscore the limited scope of appellate review of determinations of credibility, rather than a precise and exhaustive statement of the test for determining that scope." 130 F.3d at 801–02. The court reasoned that the example of an affidavit contradicting earlier deposition testimony demonstrates that "the test of physical impossibility is not exhaustive." *Id.* at 802. The court further noted that the Supreme Court has stated that, in determining a witness's credibility, factors other than demeanor and inflection are considered. *Id.* "Documents or objective evidence may contradict the witness' [sic] story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination." *Id.* (internal quotation marks omitted) (quoting *Anderson v. Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). The Seventh Circuit further noted that although this quote from *Anderson* was related in the context of appellate review it is equally applicable to summary judgment. *Id.* The court stated that "testimony can and should be rejected without a trial if, in the circumstances, no reasonable person would believe it." *Id.* (citations omitted); *see also Respect, Inc. v. Committee on the Status of Women,* 781 F.Supp. 1358, 1367 (N.D.Ill.1992) ("[E]ven on summary judgment the district court should not credit testimony that is inher-

ently incredible ...—a standard met where, as here, the nonmoving party's story is 'irrefutably contradicted by documentary evidence.' " (citations omitted)).

The Seventh Circuit then reviewed the circumstances of the case and concluded: "We do not think that an affidavit should be allowed *without explanation* to controvert the affiant's written admissions, albeit made in documents rather than in a deposition-indeed documents that having been composed before the litigation would carry more conviction than a deposition, even though a deposition is given under oath." *Kasraian,* 130 F.3d at 804; *see also Cleveland v. Policy Management Systems Corp.,* 526 U.S. 795, 806, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) (stating that lower courts have "held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity" (citations omitted)); *Higgins v. Mississippi,* 217 F.3d 951, 955 (7th Cir.2000) (explaining that "a party cannot by affidavit retract damaging admissions without a good explanation ... whether ... the admissions were made in a deposition, a trial, another affidavit, or, as in this case, a written statement not under oath" (citations omitted)). The court also reiterated that a party "might be able to explain away his prior inconsistent statements. But here we note a corollary: if he makes no attempt at explanation, he is stuck with those statements." *Kasraian,* 130 F.3d at 804.

There are many telling unexplained inconsistencies in Church's testimony among her pleadings, depositions, answers to interrogatories, and affidavit regarding

whether and when she complained to a supervisor about the sexual harassment. In the charge that Church filed with the EEOC, dated August 13, 1999 (*supra*), attached as an exhibit to her complaint (and thus submitted as part of her pleadings, *supra*), Church stated, under penalty of perjury, that she has "not complained to [her] supervisors at the Detention Center about Sgt. Baldwin's conduct, because he is [her] immediate supervisor and has been employed at the Detention Center for many, many years." Church likewise stated that she has "not pursued an internal grievance concerning [her] sexual harassment because [she] believe[s] it is pointless, given Sgt. Baldwin's power base in the detention Center administration." In this complaint, Church does not otherwise state that she complained to a supervisor about the sexual harassment. However, in her amended complaint, Church states that she complained on April 16, 1999, to Security Chief James Drewery regarding the sexual harassment. *Am. Compl.* ¶ 11.

In the course of discovery, as discussed, Church produced three documents as evidence of her complaints: a matter of record dated August 16, 1997; a grievance/appeal dated August 16, 1997; and a grievance/appeal dated August 28, 1997, which Church asserted was a recreation of her August 16, 1997 grievance. Although Church testified that she wrote the original grievance on August 16, 1997, during a break in her shift, and then presented the grievance to Captain Bernard Young, who allegedly signed the grievance in her presence and presented her with a copy, Church's time records clearly demonstrate that she did not work August 15, 16, or 17, 1997. *See Church Dep. II* at 60–65; *Aff. of Delores C. Jackson.* Likewise, Captain Young did not work on August 15 or 16, 1997. *Aff. of Bernard Young* ¶ 6; Ex. B. Moreover, Captain Young, now retired, has stated under oath that he never received any grievance from Church alleging

sexual harassment and that the signatures on the August 16 grievance and the matter of record are not his signatures. *Id.* ¶¶ 4, 5, 7, 8, 9; Ex. B. Church has not endeavored in any manner to impeach this testimony; nor has she suggested, beyond an implied assertion of an entitlement to a trial before a jury determined to act lawlessly, on what basis it might reasonably be rejected by a factfinder. On this record, the documents are fraudulent as a matter of law.

The substance of Church's grievance and matter of record are also inconsistent with the documentary evidence. Church testified that on August 16, 1997, she complained to Security Chief Drewery about the sexual harassment. *Church Dep. II* at 292. When asked why she chose to complain to him, Church responded that she complained to Drewery about the harassment "because he's the security chief of the jail." *Church Dep. I* at 92. In August 1997, however, not only was Drewery not the Security Chief of BCDC, he did not even work there. Rather, Drewery was the Shift Commander (Major) for the A-shift at the BCBIC, and Hakim M. Muhammad served as Security Chief of the BCDC. *Drewery Aff.* Moreover, Drewery was not scheduled to work on August 16, and 17, 1997, which were his regularly scheduled days off. *Id.* He also states in his affidavit that at no time did Church relate to him that she was being sexually abused. *Id.* ¶ 8.

Furthermore, in Church's affidavit accompanying her opposition to the summary judgment motions, Church stated that the alleged harassment began in June 1997, that Church told Baldwin that his conduct was unwelcome, and that, when it was apparent that she was getting no where, she filed a written complaint. *Church's Aff.* ¶¶ 3–4. She also stated that she complained to Drewery at about the

same time that she filed the written grievance (August 1997) and that Drewery advised her to "rethink what [she] was doing in charging Sgt. Baldwin with sexual harassment; he told [her] it was a 'serious matter,' and pointed out it would be [her] word against his, with 'no proof' to corroborate [her] allegations." *Id.* ¶ 4. In her deposition, Church testified that she complained to Security Chief Drewery in June 1997 and at that time he told her to rethink her allegations as "it was his word against mine, and I didn't have any proof." *Church Dep. I* at 70–71, 76. (As stated *supra*, she also testified that she complained to Drewery on August 16, 1997, and Drewery stated that he was not a Security Chief at this time).

Moreover, Church's affidavit states that after her "initial rebuff by Security Chief Drury [sic], [she] had spoken with Mr. Drury [sic] on several occasions about Sgt. Baldwin's misconduct, and, on at least one occasion had spoken with another Division of Corrections official, Major Naomi Williams, about the situation." *Church Aff.* ¶ 9. Even though she testified on deposition and in her affidavit that she complained to Drewery in July and/or August of 1997, she also testified that *after* August 1997, she "[v]erbally complained constantly on a continuous basis" to Security Chief Drewery, and complained to Major Naomi Williams in May 1999. *Church Dep. I* at 105–06. When questioned more closely, Church testified that when she requested to meet with Major Williams, the Major was going to pick up her sister and did not have the time to speak with Church. *Id.* at 107–09. Church then admitted that she did not meet Major Williams. *Id.* at 109. Church also testified that she had complained to Drewery and Williams that she was unable to perform her job duties effectively in June, July, and August 1997. *Church Dep. II* at 75–76.

Nowhere in her opposition memorandum or its exhibits did Church attempt to explain or reconcile these glaring inconsistencies among the sworn EEOC testimony, the three deposition transcripts, and Church's affidavit. *See Kasraian*, 130 F.3d at 804. Documents and objective evidence contradict Church's testimony, and Church's story is "internally inconsistent" and "implausible" on its face so that a reasonable factfinder would not credit it. *See Kasraian*, 130 F.3d at 802. Moreover, "[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two [or in this case many] conflicting versions of the plaintiff's testimony is correct." *Celotex*, 736 F.2d at 960 (citing *Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 544 (9th Cir.1975)). As the court in *Kasraian* explained: "we do not think that an affidavit should be allowed without explanation to controvert the affiant's written admissions, albeit made in documents rather than in a deposition—indeed documents that having been composed before litigation would carry more conviction than a deposition, even though a deposition is given under oath." *Kasraian*, 130 F.3d at 804. In this instance, there is an EEOC complaint, executed under oath and before litigation began, that clearly states that Church did not complain before the EEOC complaint itself. Moreover, this EEOC statement was attached to her pleadings. It is evident that the EEOC complaint carries more weight, particularly in light of the fact that Church has not attempted to explain these inconsistencies away. Accordingly, no reasonable person could conclude on this record that the State knew about the sexual harassment before it received a copy of the August 13, 1999, letter to the EEOC. As a matter of law, furthermore, once the charges came to the attention of the State, responsible officials took

proper remedial action, changing both Baldwin's and Church's assignments.

## B. Title VII Retaliation Claim

 To establish a prima facie case of retaliation, a plaintiff must prove that "(1) she engaged in a protected activity; (2) the employer took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the asserted adverse action." *Von Gunten v. Maryland,* 243 F.3d 858, 863 (4th Cir.2001) (citing *Beall v. Abbott Labs.,* 130 F.3d 614, 619 (4th Cir.1997)). Once the plaintiff has established a prima facie case, the defendant has the burden of producing evidence of a legitimate nondiscriminatory reason for the adverse action. *Munday v. Waste Mgmt. of N. America, Inc.,* 126 F.3d 239, 242 (4th Cir.1997) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir.1985)), *cert. denied* 522 U.S. 1116, 118 S.Ct. 1053, 140 L.Ed.2d 116 (1998). If the defendant raises a genuine issue of fact, then the plaintiff bears the burden of proving retaliation by demonstrating that the employer's reason is pretextual. *Id.* (citing *Carter v. Ball,* 33 F.3d 450, 459 (4th Cir.1994); *Obi v. Anne Arundel County,* 142 F.Supp.2d 655, 672 (D.Md.2001).

The first element of Church's prima facie case is clearly met by proof that she filed an EEOC charge on September 27, 1999. (In her response, Church asserts that it is clear that she engaged in a protected activity, although she does not specify exactly what that activity was. *Mem. in Supp. of Pl.'s Resp. to State Defs.' Mot. for Summ. J.* at 8. I presume that she is referring to the filing of the EEOC charge on September 27, 1999. She may also be referring to her complaining to her supervisors. *See Thomas v. BET Soundstage Restaurant,* 104 F.Supp.2d 558, 563 (D.Md.2000). However-

er, as discussed, it is clear as a matter of law that Church has not generated a genuine dispute of material fact as to whether she complained to her superiors prior to faxing to the agency a copy of the August 13, 1999, letter to the EEOC.)

 As for the second element, it appears, as discussed *supra,* that Church alleges that the State retaliated against her by issuing a reprimand in June 1999, by suspending her wages and benefits, and ultimately terminating her. To the extent that any such action pre-dated the State's receipt of the August 13, 1999, letter, however, it is clear that there could be no showing of causation. Moreover, the reprimand is not an adverse employment action. *See also Obi,* 142 F.Supp.2d at 672–73 (explaining that what constitutes an adverse employment action includes inquiry into "whether there has been discrimination in what could be characterized as ultimate employment decision such as hiring, granting leave, discharging, promoting and compensation" and "whether the action adversely affects a term and condition of employment"(citations omitted)); *Von Gunten,* 243 F.3d at 869 (acknowledging that there is no adverse employment action where an employer enforces a generally applicable policy against an employee and determining that an employer requiring an employee to comply with sick leave policy is not an adverse employment action).

 In any event, "[t]o survive summary judgment ... [Church] must have evidence from which a reasonable factfinder could conclude that a causal connection exists between the protected activity and the adverse action." *Dowe v. Total Action Against Poverty in Roanoke Valley,* 145 F.3d 653, 657 (4th Cir.1998). "To satisfy the third element, the employer must have taken the adverse employment

action because the plaintiff engaged in a protected activity." *Id.*

> While causation depends largely on the particular facts and circumstances of a case, factors pertinent to the causation element may include temporal proximity between the two events, an intervening pattern of retaliatory conduct, inconsistent reasons by the employer for the adverse action, and differential treatment of other employees.

*Jaudon,* 125 F.Supp.2d at 165.

■ The Fourth Circuit has held "that evidence that the alleged adverse action occurred shortly after the employer became aware of the protected activity is sufficient to 'satisfy the less onerous burden of making a prima facie case of causation.'" *Dowe,* 145 F.3d at 657 (quoting *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 457 (4th Cir.1989)). Conversely, the Fourth Circuit has determined that the opposite is equally true. *Id.; Jaudon,* 125 F.Supp.2d at 165. "A lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action ... negates any inference that a causal connection exists between the two." *Dowe,* 145 F.3d at 657 (citations omitted). Application of these principles makes clear that Church's retaliation claim as to the termination of her employment fails as a matter of law.

■ First, Church has not presented any evidence (or supported an inference) connecting her protected activity and her termination; thus, she cannot establish that she was fired because she complained. *See Ross,* 759 F.2d at 364 (stating that "the nonmoving party must produce 'specific facts showing that there is a genuine issue for trial,' rather than resting upon the bald assertions of his pleadings") (quoting Fed.R.Civ.P. 56(e)); *Graves–Humphreys Co.,* 818 F.2d at 1128 (noting that there is an affirmative duty for "the trial judge to prevent factually unsupported claims and defenses from proceeding to trial"). Rather, Church, simply and insufficiently, argues, without citation to the record or to any evidence, that she "has made an adequate showing of causation for [Church's] retaliation claim to meet the standards governing prima facie claims." *Mem. in Supp. of Pl.'s Resp. to State Defs.' Mot. for Summ. J.* at 9 (referring to *Warren v. Halstead Industries, Inc.,* 802 F.2d 746, 756 (4th Cir.1986); *Tinsley v. First Union Nat'l Bank,* 155 F.3d 435, 443 (4th Cir.1998)).

Second, the lapse of fourteen months (from the State's receipt of the EEOC letter in September 1999 and her termination in November 2000) between Church's protected activity and her termination does not permit an inference that the two are causally connected. *Clark County School District v. Breeden,* 532 U.S. 268, ——, 121 S.Ct. 1508, 1511, 149 L.Ed.2d 509 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." (citing *O'Neal v. Ferguson Construction Co.,* 237 F.3d 1248, 1253 (10th Cir.2001); *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir.1997) (3–month period insufficient); *Hughes v. Derwinski,* 967 F.2d 1168, 1174–75 (7th Cir.1992) (4–month period insufficient))); *see id.* (determining that a twenty month period was insufficient).

In response, Church argues that in many cases, "courts have permitted an inference of 'causal connection' simply from the fact [that] the adverse personnel action against [Church] followed almost immediately after [Church's] protected activity." *Mem. in Supp. of Pl.'s Resp. to State Defs.' Mot. for Summ. J.* at 9. How-

ever, Church provides no facts or evidence in support of this statement and cites only to cases in which the courts determined that there was a causal connection in instances where the time periods ranged from the same day to four months. *Id.* (citing *Harris v. Harvey,* 993 F.Supp. 1181, 1188 (N.D.Ill.1998) (1–month period sufficient); *LaRocca v. Precision Motorcars, Inc.,* 45 F.Supp.2d 762, 767–74 (D.Neb.1999) (11–day period sufficient); *King v. Preferred Tech. Group,* 166 F.3d 887, 893 (7th Cir.1999) (1–day period sufficient); *Berman v. Orkin Exterminating Co.,* 160 F.3d 697, 702 (11th Cir.1998) (5–week period sufficient); *EEOC v. HBE Corp.,* 135 F.3d 543, 554 (8th Cir.1998) (a period of hours sufficient); *McClendon v. Indiana Sugars, Inc.,* 108 F.3d 789, 796–97 (7th Cir.1997) (2 to 3–day period sufficient); *Kim v. Nash Finch Co.,* 123 F.3d 1046, 1061 (8th Cir.1997) (4–month period sufficient); *Johnson v. Fort Wayne,* 91 F.3d 922, 939 (7th Cir.1996) (2–week period sufficient); *Wyatt v. Boston,* 35 F.3d 13 (1st Cir.1994) ("almost simultaneously" is sufficient); *Dudley v. Augusta Sch. Dep't,* 23 F.Supp.2d 85, 93 (D.Me.1998) (16–day period sufficient)).

In sum, I conclude that Church has failed to project evidence sufficient to establish that a causal connection exists between her September 1999 protected activity and the subsequent adverse employment action in November 2000. As a result, Church cannot establish a prima facie case of retaliation under Title VII.

■ However, assuming that Church has established a prima facie case of discriminatory retaliation, unrebutted legitimate, non-discriminatory reasons support the State's determination to place Church on leave without pay status and, ultimately, to terminate Church's employment. As explained *supra,* Commissioner Flanagan recommended Church's termination after months of insubordination, her repeated failure to produce required documentation, and conduct that evidenced a blatant disregard for the legitimate operational needs of the employer. Moreover, Church has failed to offer any evidence to refute Defendant's proffer of legitimate, nondiscriminatory reasons for placing her on leave without pay status and ultimately terminating her. Although wages and benefits are benefits of employment, the Fourth Circuit has recognized that the "terms, conditions, or benefits of a person's employment do not typically, if ever, include general immunity from the application of basic employment policies or exemption from a state agency's disciplinary procedures." *Von Gunten,* 243 F.3d at 869. The State is therefore entitled to summary judgment on Church's retaliation claim because Church cannot establish any causal connection between her complaint of discrimination and the alleged adverse employment action, and defendant has identified multiple non-discriminatory reasons for her discharge, which Church has failed to refute or to offer any evidence of pretext.

### C. Claim Preclusion

Defendants argue that they are entitled to summary judgment because Church's claims in this case are barred by the principles of res judicata or claim preclusion. As previously described, Church filed a pro se claim in the District Court of Maryland for Baltimore City before she filed this case. The complaint alleged claims for gender based discrimination, sexual harassment, and retaliation by her employer, "Baltimore City Detention Center, Maryland Department of Public Safety," but the only defendant named was Baldwin. The case was transferred to the Circuit Court for Baltimore City upon Baldwin's request for a jury trial. On September 21, 2000, Baldwin filed a motion for summary judgment, and despite Church's letter request that the case be stayed or dismissed

without prejudice because she intended to file suit against Baldwin in federal court, the case was "dismissed with prejudice" and a final judgment was entered "in favor of [Baldwin] for costs." Thereafter, the circuit court denied Church's motion to alter judgment. On these facts, the State is not entitled to judgment on the ground of claim preclusion, but Baldwin is so entitled.

 The Supreme Court explained the rule of res judicata in *Commissioner v. Sunnen,* 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948) as follows:

> The general rule of res judicata ... provides that when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound "not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose."

*Id.* at 597, 68 S.Ct. 715 (quoting *Cromwell v. County of Sac,* 94 U.S. 351, 352, 24 L.Ed. 195 (1876)). Therefore, "[a]s a general principle, the plaintiff must assert in his first suit all the legal theories he wishes to assert, and the failure to assert them does not deprive the judgment of its effect as res judicata." 1B MOORE'S FEDERAL PRACTICE ¶ 0.410[1] (2d ed.1995) (footnote omitted).

 "[A]ll federal courts must give full faith and credit to valid state court judgments." *In re Genesys Data Techs.,* 204 F.3d 124, 127–28 (4th Cir.2000); *see Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984) ("It is now settled that a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered."). Title 28 of the United State

Code, § 1738, directs federal courts to afford state court judgments full faith and credit. *In re Genesys Data Techs.,* 204 F.3d at 127; *see Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 466, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982), *reh'g denied,* 458 U.S. 1133, 103 S.Ct. 20, 73 L.Ed.2d 1405.

The Fourth Circuit has explained:

> Section 1738 provides that state judicial proceedings "shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken." ... The Supreme Court has expressly held that the full faith and credit statute "directs a federal court to refer to the preclusion law of the State in which judgment was rendered." ... Thus, § 1738 "does not allow federal courts to employ their own rules of res judicata in determining the effect of state judgments. Rather it goes beyond the common law and commands a federal court to accept the rules chosen by the State from which the judgment is taken."

> Federal courts are to follow a two-step process in determining whether § 1738 should apply in a particular situation.... First, a federal court must look to state law to determine the preclusive effect of the state court judgment.... If state law would not bar relitigation of an issue or claim decided in the earlier proceeding, then the inquiry ends-a federal court will not give the state court judgment preclusive effect either. If state law would afford the judgment preclusive effect, however, then a federal court must engage in a second step-it must determine if Congress created an exception to § 1738. Only if "some exception to § 1738 applies" can a federal court refuse to give a judgment the preclusive effect to

which it is entitled under state law. . . . An exception "will not be recognized unless a later statute contains an express or implied partial repeal." . . . *In re Genesys Data Techs.*, 204 F.3d at 127–28 (first and second alterations in original) (citations omitted).

 Under Maryland law, res judicata has three elements:

(1) the parties in the present litigation should be the same or in privity with the parties to the earlier case; (2) the second suit must present the same cause of action or claim as the first; and (3) in the first suit, there must have been a valid final judgment on the merits by a court of competent jurisdiction.

*deLeon v. Slear*, 328 Md. 569, 616 A.2d 380, 385 (1992) (citations omitted).

 Examining these elements in reverse order, indisputably, under Maryland law, a dismissal "with prejudice" qualifies as an adjudication "on the merits" and thus satisfies that requirement of res judicata. *See, e.g., Wooddy v. Wooddy*, 270 Md. 23, 309 A.2d 754, 758 (1973); *Berrain v. Katzen*, 331 Md. 693, 629 A.2d 707 (1993); *Moore v. Pomory*, 329 Md. 428, 620 A.2d 323, 325 (1993); *see also* BLACK'S LAW DICTIONARY (6th ed.1990) (stating that dismissal with prejudice is a "[t]erm meaning an adjudication on the merits, and final disposition, barring the right to bring or maintain an action on the same claim or cause" and that "[i]t is res judicata as to every matter litigated").

 As to the second requirement, to determine whether claims are the same for the purposes of res judicata, Maryland law employs the transaction test, "as set forth in § 24 of the Restatement (Second) of Judgments." *deLeon*, 616 A.2d at 389–90 (citing *Kent County Bd. of Educ. v. Bilbrough*, 309 Md. 487, 525 A.2d 232 (1987)). The Court of Appeals of Maryland explained the test as follows, quoting from the Restatement (Second) of Judgments § 24, comment a and *Bilbrough*, 525 A.2d at 237–38:

The present trend is to see a claim in factual terms and to make it coterminous with the transaction regardless of the number of substantive theories, or variant forms of relief flowing from those theories, that may be available to the plaintiff; regardless of the number of primary rights that may have been invaded; and regardless of the variations in the evidence needed to support the theories or rights. The transaction is the basis of the litigative unit or entity which may not be split.

*deLeon*, 616 A.2d at 390.

The court in *Bilbrough* further stated:

(1) When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar . . ., the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose. (2) What factual grouping constitutes a "transaction", [sic] and what groupings constitute a "series", [sic] are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

*Bilbrough*, 525 A.2d at 237–38 (internal quotation marks omitted) (quoting *Restatement (Second) of Judgments* § 24); *see also Anyanwutaku v. Fleet Mortgage Group Inc.*, 85 F.Supp.2d 566, 570 (D.Md.) (stating that "[i]n determining whether the causes of action stem from the same transaction or series of connected transactions, courts consider such pragmatic factors as

'whether the facts are related in time, space, origin, or motivation whether they form a convenient trial unit, and wether their treatment as unit conforms to the parties' expectations or business understanding or usage" (quoting *Restatement (Second) of Judgments* § 24(2))), *aff'd*, 229 F.3d 1141 (4th Cir.2000).

Claims for gender-based discrimination, sexual harassment, and retaliation were clearly and specifically set forth as causes of action in the previously adjudicated state action. The state case also involved the same set of facts. In her complaint to the District Court of Maryland for Baltimore City, Church stated that "[i]n approximately April 1999[, her] immediate supervisor Sgt. Ronald Baldwin known as ("Taz") began sexually harassing [her,] asking if he could feel [her] breasts and vagina[,] asking if [she] would show [her] underwear[,] asking if [she] would submit to oral or anal intercourse on the job." Thus, the state case involved the same facts and set of events as the present case. Church's attempt to recharacterize these causes of action under 42 U.S.C. § 1983 and the State Declaration of Rights, Article 46, will not allow the plaintiff to circumvent the absolute bar created by prior adjudication. *See, e.g., Bilbrough*, 525 A.2d at 236–37; *Mettee v. Boone*, 251 Md. 332, 247 A.2d 390 (1968); *Alvey v. Alvey*, 225 Md. 386, 171 A.2d 92 (1961).

Furthermore, as to the additional causes of action presented in the instant action that were not specifically delineated in the state court case (violation of plaintiff's freedom of association and speech, intentional infliction of emotional distress, and invasion of privacy), these causes of action were, manifestly, part of the "transaction" and arose from the same facts of gender discrimination, sexual harassment, and retaliation that Church alleged in state court. As I have explained, "[a]s a general principle, the plaintiff must assert in his first

suit all the legal theories he wishes to assert, and the failure to assert them does not deprive the judgment of its effect as res judicata." *Lockett v. West*, 914 F.Supp. 1229, 1233 (D.Md.1995) (alteration in original) (internal quotation marks omitted) (quoting 1B *Moore's Federal Practice* ¶ 0.410[1] (2d ed.1995)); *Anyanwutaku*, 85 F.Supp.2d at 571 ("Claims may also arise out of the same transaction or series of transactions even if they involve different harms or different theories or measures of relief."); *Colandrea v. Wilde Lake Community Association, Inc.*, 361 Md. 371, 761 A.2d 899, 908 (2000) ("... If the second suit is between the same parties and is upon the same cause of action, a judgment in the earlier case on the merits is an absolute bar, not only as to all matters which were litigated in the earlier case, but as to all matters which could have been litigated." (alteration in original) (internal quotation marks omitted) (citations omitted)).

Church purports to allege a claim that, as a result of the sexual harassment and retaliation to which she was subjected by Baldwin, she was not permitted to "associate" with Joyner, her co-employee at the BCDC. Church contends that her alleged freedom to associate and to speak with Joyner was restricted in retaliation for her objections to the sexual harassment. The causes of action for the alleged violations of Church's freedom of association and speech are based solely upon the underlying claims for sexual harassment, gender discrimination, and retaliation. Therefore, this claim could have and should have been litigated in the initial action. As for the emotional distress claim, Church alleges that she was caused severe emotional distress as a result of Baldwin's continuous sexual advancements and sexually offensive statements. To prove this cause of action, Church must prove the same facts necessary to sustain the sexual harass-

ment, gender discrimination, and retaliation claims. Because this cause of action flows from the same facts as the previously adjudicated claims, Church is barred from pursuing it in the present case. Finally, Church identifies a single episode of what she alleges to be sexually harassing behavior but classifies this as an invasion of her privacy. This claim also could have brought in the prior action and is precluded from re-litigating this cause of action.

 The final issue is the requirement of privity. It is obvious that there is identity of party between Church and Baldwin. The State seeks solace on this issue in its employment relationship with Baldwin. I am not persuaded.

Specifically, the State argues, relying on *deLeon,* 616 A.2d at 388–89, that "[a]lthough Defendant Baldwin and the State are not identical parties, privity exists between the two parties based on their employment relationship." *Mem. of Law in Supp. of the State Def.'s Mot. for Summ. J.* at 49. In *deLeon,* the plaintiff, a doctor employed as a house surgeon by St. Joseph's hospital in Baltimore, Maryland, was denied, by the St. Joseph's medical staff privileges. 616 A.2d at 382. In formulating this decision, St. Joseph's investigated the plaintiff's credentials, a process that included asking the head of surgery, Dr. Macon, to remark on the plaintiff's abilities. *Id.* Dr. Macon provided St. Joseph's, among other things, various complaints that he had received regarding the plaintiff from the nursing staff at the hospital. *Id.* The plaintiff appealed the decision through the hospital's review process and meanwhile remained at St. Joseph's as a house surgeon. *Id.* at 574, 616 A.2d 380. During this period, Dr. Macon continued to receive complaints from the nursing staff regarding the plaintiff.

The appeal board met and denied the plaintiff medical staff privileges. *Id.* That same day, the plaintiff and his wife, citizens of the Philippines, "filed a diversity action in the United States District Court for the District of Maryland against the hospital and Dr. Macon," seeking, in part, compensatory and punitive damages based on alleged defamation. *Id.* The plaintiff did not sue any member of the nursing staff at this time; however, in the complaint and on deposition, the plaintiff referred to two nurses as the probable source of the allegedly defamatory statements. *Id.* at 383. The federal court granted the defendants' motion for summary judgment in an unreported opinion, *id.,* and the judgment was affirmed by the United States Court of Appeals for the Fourth Circuit, *De Leon v. St. Joseph Hospital, Inc.,* 871 F.2d 1229 (4th Cir.), *cert. denied,* 493 U.S. 825, 110 S.Ct. 87, 107 L.Ed.2d 52 (1989). *Id.* at 383.

While the appeal to the Fourth Circuit was pending, the plaintiff brought suit against the two nurses in the Circuit Court for Baltimore City for defamation, referring to the statements that the nurses related to Dr. Macon regarding the plaintiff's abilities. *Id.* Ultimately, the circuit court granted the nurses' motion for summary judgment based on res judicata, collateral estoppel, and statute of limitations. *Id.* at 384. On appeal, the Court of Special Appeals of Maryland affirmed in part and reversed in part, based, in part, on reasoning that none of the counts were barred by res judicata as there was no privity and the claims in the two cases were not the same. *Id.* at 385–85. The Court of Appeals reversed, determining that all of the counts were barred by res judicata. *Id.* at 385.

In so doing, the court adopted *The Restatement (Second) of Judgments* § 51 (1982), which states in regards to privity:

Persons Having a Relationship in Which One Is Vicariously Responsible for the Conduct of the Other

If two persons have a relationship such that one of them is vicariously responsible for the conduct of the other, and an action is brought by the injured person against one of them, the judgment in the action has the following preclusive effects against the injured person in a subsequent action the other.

(1) A judgment against the injured person that bars him from reasserting his claim against the defendant in the first action extinguishes any claim he has against the other person responsible for conduct unless:

(a) The claim asserted in the second action is based upon grounds that could not have been asserted against the defendant in the first action; or

(b) The judgment in the first action was based on a defense that was personal to the defendant in the first action.

\*　　\*　　\*　　\*　　\*　　\*

*Id.; see deLeon*, 616 A.2d at 387.

The plaintiff in *deLeon* argued that the above exceptions, (a) and (b), in *The Restatement* applied. The court concluded that

the nurses, by virtue of their employment relationship with the hospital, are in privity with the hospital for purposes of applying the doctrine of res judicata. They were employed by the hospital at the time of the alleged defamations, and it is undisputed that the nurses were acting in the scope of their employment. The basis for Dr. DeLeon's federal court defamation action against the hospital was that the hospital, a corporation, was liable for defamatory statements allegedly made by its employees.

*deLeon*, 616 A.2d at 389.

Here, the State argues that the same has happened in the present case and neither of the exceptions apply, in that the claims in both cases are identical; Church complains of sexual harassment and discrimination by Baldwin and her employer, and judgment was based on Church's failure to prosecute her claim and therefore is not personal to any defendant. *Mem. of Law in Supp. of the State Def.'s Mot. for Summ. J.* at 50. I reject this analysis, however; rather, I am persuaded that both of the exceptions apply here, as the present case involves Title VII claims.

It is clear and well-settled that no Title VII claim lies against Baldwin (although, to be sure, Church, a layperson, argued that such a claim could be asserted against Baldwin in the state court case). *See Lissau v. Southern Food Service, Inc.*, 159 F.3d 177, 180 (4th Cir.1998) ("An analysis of Title VII's language and its remedial scheme leads us to join the other circuit courts and conclude that [individuals] are not liable in their individual capacities for Title VII violations."); *Londeree v. Crutchfield Corp.*, 68 F.Supp.2d 718, 723–24 (W.D.Va.1999), *aff'd without op.*, 210 F.3d 361 (4th Cir.2000). Therefore, the exceptions laid out in *The Restatement* are applicable here. *The Restatement* explains the rationale for the two exceptions:

The injured person's claims against the active wrongdoer are the persons vicariously responsible for the latter's conduct are sometimes only partially congruent. There may be a basis of liability that he can assert against one but not the other. The rule of claim preclusion is properly applied with respect to the claim that he has against them commonly but it should not apply to his independent claim against the obligor not sued in the first action. If the rule of claim preclusion were applied to that independent claim, the effect would be to compel a joinder of parties therein which by hypothesis he is not required to make. So also his claim against one of the obligors may be subject to a defense that is not available to the other obligor. When such a defense has been interposed in the first action, a judgment against the

injured person is not incompatible with his obtaining a judgment against the other obligor, any more than it would be if they were sued in the same action. THE RESTATEMENT (SECOND) OF JUDGMENTS § 51, at 51.

The present case can be fitted into either of the *Restatement* exceptions. Title VII, as noted, is a basis of liability that can only be asserted against one's employer; therefore, res judicata does not apply to Church's Title VII claim against the State, which she did not sue in the first case. Moreover, it appears that Baldwin asserted the defense of inapplicability of Title VII (to him, a coworker) in his motion for summary judgment, which was granted. That defense is not available to the State; it was "personal" to Baldwin. Therefore, on the issue of claim preclusion, the State is not entitled to summary judgment.

Res judicata is applicable to Baldwin, however, and therefore summary judgment shall be granted in favor of Baldwin as all claims in the present case are precluded.

## V. CONCLUSION

An Order effectuating the determinations made herein and entering judgment in favor of the defendants follows.

### ORDER

In accordance with the foregoing Memorandum, it is this 17th day of January, 2002, by the United States District Court for the District of Maryland, ORDERED

(1) That the State defendant's motion for summary judgment (Paper No. 34) is GRANTED; and it is further ORDERED

(2) That defendant Baldwin's motion for summary judgment (Paper No. 41) is GRANTED; and it is further ORDERED

(3) That JUDGMENT IS ENTERED IN FAVOR OF ALL DEFENDANTS AGAINST PLAINTIFF; and it is further ORDERED

(4) That the Clerk shall CLOSE THIS CASE and TRANSMIT copies of this Order and the foregoing Memorandum to the attorneys of record.